Filed 7/2/18; pub order 7/27/18 (see end of opn.)

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re COLLIN E., a Person Coming Under the Juvenile Court Law. | |
| | D072988 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3941) |
| v. | |
| H.S. et al., | |
| Defendants and Appellants. | |


APPEALS from findings and orders of the Superior Court of San Diego County,
Gary M. Bubis, Judge.  Affirmed.


Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and
Appellant H.S.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and
Appellant James E.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

H.S. and James E. appeal an order terminating parental rights to their son, Collin E., under Welfare and Institutions Code section 366.26.[1] James and H.S. argue there is no substantial evidence to support the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) finding that continued custody of the child by the parents was likely to result in serious emotional or physical damage to the child. (25 U.S.C. § 1912(f), Welf. & Inst. Code § 224.6, subd. (b)(1).) They also assert the juvenile court erred when it determined the beneficial parent-child relationship exception did not apply and terminated parental rights. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2015, the San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivision (b) on behalf of 13-month-old Collin E. The petition alleged Collin's mother, H.S., had left him unattended in her car while she was under the influence of a prescription narcotic medication. Police officers arrested H.S. for willful cruelty to a child and being under the influence. H.S. told officers she had taken 50 mg of morphine prescribed for pain caused by a brain tumor.

The Agency alleged Collin had suffered, or was at substantial risk of suffering, serious physical harm or illness due to his parents' inability to provide adequate care. (§ 300, subd. (b).) In reports prepared for the dependency proceedings, the Agency

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

2

described James's and H.S.'s extensive histories of substance abuse, drug-related criminal histories, and lack of effective treatment.

H.S. completed detox in 2003, 2009, February and July 2010, and 2011. In 2011, H.S. lost custody of her three-month-old daughter to the child's father after she was arrested for trying to buy Xanax with a fake prescription. At that time, the Agency opened a voluntary services case but H.S. minimized her substance abuse and refused treatment. H.S. was involuntarily committed in January 2013. She went through another detox program in April 2013, and accidentally overdosed in May 2013. H.S. claimed she needed pain medication for a brain tumor. A neurological examination in December 2013 revealed she did not have a brain tumor.

James's family reported he started using crystal methamphetamine as a teenager in approximately 1993 and had been in and out of jail for many years. James had lost custody of a son, now an adult, when he was incarcerated. James overdosed in jail and went through intensive therapy. He completed a substance abuse treatment program in November 2014.

When Collin was born, because of H.S.'s history of opiate abuse, the Agency investigated a referral for general neglect. Collin did not exhibit any withdrawal symptoms and the parents' families were very supportive. The Agency made a referral to a home health nurse but did not initiate dependency proceedings. When Collin was eight weeks old, the parents took him to the emergency room for treatment of a traumatic head injury related to a fall. James said he did not know what had happened. In August, the Agency received another report of general neglect when Collin underwent corrective foot

surgery. He was dirty and appeared neglected. The parents could not be reached for an hour and a half after the surgery. When H.S. arrived, she appeared to be intoxicated and was unable to hold Collin. James said H.S. was just tired.

The paternal grandfather (Grandfather) and his fiancé (together, Caregivers) purchased supplies for Collin and cared for him three to four times a week, including weekends. They took him to baseball games, the beach, the park, the zoo, Disneyland, and swimming. Grandfather supplied several thousand dollars of baby supplies for Collin, helped H.S. and James financially, and cosigned a lease after the parents were evicted when Collin was six months old. Grandfather held a one-year birthday party for Collin. James was two hours late to the party. H.S. was five hours late to the party and fell asleep.

Collin missed several pediatric appointments while in the parents' care. A neighbor told the social worker she overheard the parents arguing for an hour about who would feed Collin, who cried throughout their argument. Another neighbor said the parents were constantly screaming and fighting, and Collin cried "all the time." H.S. asked Grandfather's fiancé for money to buy pain medication for her brain tumor, and offered to let Collin stay with them for five days in exchange for money. H.S. said Collin had only had mashed potatoes and milk to eat that day because she had to use all her money for the doctor.

In May 2015, the Agency received a referral alleging H.S. was frequently going to the local convenience store and inhaling gas from whipped cream cans while holding Collin. Surveillance video confirmed the allegation. A confidential reporter said the

4

parents left Collin in his swing for extended periods and were doing drugs. James and H.S. denied any substance abuse and refused to drug test. The Agency provided service referrals to the parents. On July 21, when H.S. was arrested, the Agency detained Collin in protective custody.

The Agency placed Collin with Caregivers on July 23, 2015. At almost 14 months old, Collin was not yet walking or using any words. He wore braces on his legs at night. Collin displayed difficult behaviors, including biting, scratching, and having tantrums.

H.S. denied any substance abuse. She denied having been arrested and said she had been suffering from low blood pressure when she left Collin in the car by himself. Family members said James had lost 30 pounds in two months. They believed he was using drugs again. James said he only took medication prescribed for back pain and anxiety, including clonazepam, morphine sulfate, and hydromorphone. James advised the social worker H.S. took morphine during her pregnancy for a brain tumor. He used morphine to alleviate the pain from past methamphetamine addiction, which had caused his body to break down. According to the social worker, H.S. and James continued to provide inaccurate and conflicting statements about their use of prescription medication. They did not follow through with referrals for substance abuse treatment and appeared unwilling to discontinue using narcotics or obtain alternative methods for pain relief.

In October 2015, Collin was diagnosed with moderate receptive and severe expressive language delays and was referred to San Diego Regional Center for early intervention services. Collin had multiple appointments each week for services. Issues being addressed included foot deformities, anemia, respiratory issues, eczema and

5

allergies, hearing and speech deficiencies, hyperactivity, sensory processing disorder, and surgery for hearing loss. Because of his behaviors, Collin was removed from several daycare facilities. He had speech therapy twice a week, occupational therapy once a week, physical therapy twice a week, and was taking soccer and swim lessons, with minimal participation by his parents. Caregivers gave the dates of all upcoming appointments to the parents.

In reports prepared for the six-month review hearing, the social worker stated Collin was happy with Caregivers. He called their house "home." H.S. and James lacked motivation to resolve their substance abuse problems. Visitation had not been expanded because of the parents' noncompliance with services. As of May 20, H.S. had been clean for 175 days. She was pregnant and due in late August. H.S. continued to take methadone on the advice of her doctor and was decreasing the dose slightly each week. James was taking hydromorphone, the muscle relaxant cyclobenzaprine, morphine, and diazepam.

H.S. had a C-section a month before her due date. The baby had some withdrawal symptoms and was briefly subject to a hospital hold. H.S. was discharged from the hospital at the end of July with 45 Percocet pills. On August 8, she went to the emergency room seeking pain medication for migraines. Medical staff believed this was drug seeking behavior because H.S. did not have any history of migraines. They nevertheless refilled the prescription for Percocet.

In September 2016, the social worker reported that James missed four drug tests, which had to be rescheduled, and tested positive for hydromorphine, morphine, and

6

oxazepam. James paid for, and attended, Collin's swimming lessons. During visits with his parents, Collin asked Grandfather to stay. Grandfather said Collin treated James like an uncle and was happy to return to Caregivers' home. The parents did not attend any of Collin's therapy or doctor appointments during the second six-month review period.

On September 13, H.S. obtained a new prescription for morphine sulfate for fibroid pain. The parents' levels of morphine indicated substance abuse. The social worker said a prescription of morphine for fibroid pain was unusual, especially because H.S.'s medical chart was flagged for narcotic drug abuse. The social worker reported if a patient was taking hydrocodin, hydromorphone, or Tylenol, any level greater than 12,000 to 15,000 ng/gl was considered substance abuse. On October 17, H.S.'s morphine levels were greater than 100,000 ng/gl. When H.S. tested at the end of October, her morphine levels were 6,226 ng/ml. On October 28, James tested positive for morphine at a level greater than 100,000 ng/ml. He did not test the following day as requested, saying he had been in the emergency room for food poisoning.

H.S. told the social worker, "I'm not taking drugs I have prescriptions for my medication." James said, "I'm not taking drugs I have prescriptions for my medications and so does she." The social worker said the parents were still at a relatively early stage in recovery. Collin was challenging to manage and the parents needed to demonstrate strong parenting skills to adequately parent him and care for his baby brother.

Collin's court-appointed special advocate (CASA) reported that Collin was very comfortable and secure with Caregivers. They were willing to become his legal guardians or to adopt him, if that were in his best interests. Collin enjoyed his visits with

7

his parents and they attended to his needs. He asked, "Go with mama?" Collin's daycare was considering whether to keep him after he scratched and bit a staff person twice. The CASA believed that Collin should remain with Caregivers, and continue to visit with his parents and siblings.

According to the social worker, H.S. was consistently parenting Collin during visitation. James's parenting was inconsistent at times. During some visits, James lay on the couch watching movies on his cell phone while H.S. was more involved with Collin. The parents blamed Collin's behaviors on his removal from their care.

In January 2017, at the 12-month review hearing, the juvenile court terminated reunification services and set a section 366.26 hearing.

H.S. had learned in 2016 that her great uncle was an enrolled member of the Cherokee Nation. In February 2017, after resolving discrepancies in the family's lineage, which was time consuming, the Cherokee Nation declared Collin an Indian child and intervened in the dependency proceedings. In April, the juvenile court determined that ICWA applied prospectively to the dependency proceedings pursuant to section 224.3, subdivision (e)(3).[2] The Cherokee Nation asked the court to continue the section 366.26 hearing for 45 days to allow it to assess permanency plan options for Collin.

---

[2]     "If proper and adequate notice has been provided pursuant to Section 224.2, and neither a tribe nor the Bureau of Indian Affairs has provided a determinative response within 60 days after receiving that notice, the court may determine that the [ICWA] does not apply to the proceedings, provided that the court shall reverse its determination of the inapplicability of the [ICWA] and apply the act prospectively if a tribe or the Bureau of Indian Affairs subsequently confirms that the child is an Indian child." (§ 224.3, subd. (e)(3).)

The section 366.26 hearing was held on September 5, 2017, more than 25 months after Collin was detained in protective custody. The juvenile court received reports from the social worker, CASA, and Indian expert witness (Indian expert) in evidence, without cross-examination.

The social worker reported that Collin was receiving developmental services through the San Diego Regional Center and would transition to another program to continue receiving services. Collin had a history of slapping teachers, pulling hair, scratching and biting peers, throwing food, and touching feces. On one occasion, he tried to choke another child. His behaviors improved after he received additional support. His teachers became adept at anticipating some of his triggers and intervening to prevent oppositional and aggressive behaviors, which tended to occur when he received too much stimuli.

H.S. and James were having weekly supervised visits with Collin. They were consistently on time and often appropriate with him. H.S. was attentive to Collin and always provided snacks for the visit. Collin bit James at the end of one visit. James responded appropriately by putting Collin in a time out.

The social worker reported that Collin was specifically and generally adoptable, and Caregivers were eager to adopt him. She believed that adoption was in Collin's best interests. The parents had not made any significant changes to show they were committed to sobriety and could safely care for Collin. James never tried to stop using narcotics and did not participate in any treatment programs. H.S. continued to obtain narcotic medication for pain even though her medical record was flagged. The social

9

worker was concerned H.S. would never be able to stop using narcotics. Collin's special needs required the parents to remain sober.

The CASA said Collin was an energetic, active, and happy child. He was constantly in motion. Caregivers provided him with a warm, loving, safe, and stable home. They were looking forward to adopting him. Collin no longer wore a brace on his legs. His speech appeared to be within normal limits. Collin was diagnosed with attention deficit hyperactivity disorder and sensory processing disorder. He was described as a smart boy with extreme and disruptive behavioral and sensory-seeking issues. School staff reported that on visitation days with his parents, there was an increase in Collin's aggressive behaviors. Caregivers provided Collin with the stable and consistent environment he needed to thrive, and he was making progress in all areas of his development. The CASA recommended that Collin stay in his current placement and that the parents continue visiting as long as the visits were safe and supervised.

The Indian expert said regretted that tribal customary adoption was not an option for the Cherokee Nation because termination of parental rights was an extreme measure within the Native community. The parents received 23 months of active reunification efforts. During that time, H.S. did not demonstrate any commitment to sobriety. She continued to insist she did not have, and never had, a substance abuse problem. H.S. said her medical issues resulted in Collin's removal from her care. The Indian expert said Collin could not be safely returned to H.S.'s care because of his special needs, H.S.'s long history of substance abuse, and the nonrandom nature of her voluntary drug testing. The

10

Indian expert concluded that Collin's continued custody by H.S. was likely to result in serious emotional or physical damage to Collin.

The Indian expert said James denied having a substance abuse problem and did not take responsibility for the negative impact of drugs, whether prescribed or not, on his parenting. James colluded with H.S. to obtain unnecessary opiates. He missed or arrived late for all his service appointments and visitation. The Indian expert concluded that Collin's continued custody by James was likely to result in serious emotional or physical damage to Collin.

H.S. testified she cared for Collin for the first 13 months of his life and they shared a significant bond. At visits, he told her, "I love you mommy." H.S. did not believe it would be harmful to him to return home. Collin loved his little brother. The brothers saw each other three times a week and H.S. wanted them to grow up together. At visits, Collin ran to her and jumped into her arms. He cried when she left and asked why his brother could go home with her and he could not.

H.S. said James had moved out of her home four months ago to facilitate her reunification with Collin. She saw James every other day. H.S. said James never abused drugs; he was on pain medication. James was going to have back surgery and would be off his medications within two months. He was not in a substance abuse program. She and James "just [went] to meetings."

H.S. testified she last used drugs in December 2016 or January 2017, when she took Percocet and prescription morphine for her C-section and fibroids. H.S. had been on methadone since October 2015 and would discontinue its use in two weeks. She

11

acknowledged she had not attended any of Collin's doctor appointments since the last hearing or his recent educational assessment.

The Cherokee Nation did not agree with the Indian expert's conclusion that returning Collin to the parents would result in serious emotional or physical harm to him. The parents appeared to be safely caring for their other child. The Cherokee Nation was opposed to termination of parental rights.

The juvenile court said having custody of one child did not necessarily mean H.S. could adequately parent Collin. H.S. still did not understand why Collin was removed from her care. The court found that active efforts had been made to provide services and programs to prevent the breakup of the Indian family and that those efforts had proved unsuccessful. The court further found, by proof beyond a reasonable doubt, that Collin's continued custody by either parent would likely result in serious emotional or physical damage to Collin. Finding that no statutory exceptions applied, the court terminated parental rights and designated Caregivers as Collin's prospective adoptive parents.

DISCUSSION

I

A

*The Parties' Contentions*

H.S. and James contend the evidence was insufficient to support the finding by proof beyond a reasonable doubt that her or his continued custody was likely to result in serious emotional or physical damage to Collin. H.S. contends the evidence shows that by the time of the section 366.26 hearing, she had been sober for 10 months. James

12

argues the Indian expert's declaration was based on the parents' past circumstances and the fact Collin had special needs did not support the requisite finding of harm by proof beyond a reasonable doubt. James contends he participated in many of Collin's special needs appointments and proved during visitation he was capable of caring for his son. He asserts the court was required to consider whether continuation of *legal* custody, not merely physical custody, would be likely to cause emotional or physical damage to Collin.

B

*Relevant Legal Principles and Standard of Review*

"ICWA was designed to protect the best interests of Indian children and promote the stability and security of Indian tribes and families by establishing minimum federal standards for the removal of Indian children from their families by state courts and the placement of such children in foster or adoptive homes." (*In re Jack C.* (2011) 192 Cal.App.4th 967, 975-976 [declined to follow on another point by *In re Abbigail A.* (2016) 1 Cal.5th 83, 96 fn. 3]; *Adoptive Couple v. Baby Girl* (2013) 570 U.S. 637, 642; 25 U.S.C. § 1902.) To accomplish this goal, ICWA sets forth minimum substantive and procedural standards to protect the interests of Indian children and their families and tribes. (*Jack C.*, at p. 977.)

In cases involving an involuntary termination of parental rights to an Indian child, the state must demonstrate that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 1912(d).) A state court may not

involuntarily terminate parental rights to an Indian child "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" (ICWA detriment finding; § 1912(f).)

"The evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding." (25 C.F.R. § 23.121 (2016).) Without a causal relationship, "evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence or evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child." (*Ibid*.) The United States Department of Interior states: "These provisions recognize that children can thrive when they are kept with their parents, even in homes that may not be ideal in terms of cleanliness, access to nutritious food, or personal space, or when a parent is single, impoverished, or a substance abuser. Rather, there must be demonstrated correlation between the conditions of the home and a threat to the specific child's emotional or

14

physical well-being." (U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) p. 53 (Guidelines).) [3]

Before we address the substantial evidence argument, we discuss James's argument the court was required to consider whether continued *legal* custody of the child, which would allow him to continue to enjoy visitation and other rights, was likely to result in serious emotional or physical damage to the child. He contends the phrase "continued custody" in title 25 United States Code section 1912(f) and Welfare and Institutions Code section 366.26, subdivision (c)(2)(B)(ii), does not refer merely to physical custody of the child but also to legal custody of the child. (*In re Crystal K.* (1990) 226 Cal.App.3d 655, 667-668 (*Crystal K.*).)

Legal custody refers to the right and responsibility to make the decisions relating to the health, education, and welfare of a child. (Cf. Fam. Code, § 3006.) Physical custody means that a child shall reside with and be under the supervision of a person, subject of the power of the court to order visitation. (Cf. Fam. Code, § 3007.)

*Crystal K.* does not support the parents' argument the juvenile court must consider whether continued *legal* custody was likely to result in serious damage to the child without considering whether continued *physical* custody was likely to result in serious damage to the child. In *Crystal K.*, in a stepparent adoption proceeding, the trial court ruled ICWA did not apply because the child had not recently been in the father's physical custody and had not been removed from his care pursuant to court order. (*Crystal K.,*

_____

[3]     The Guidelines are instructive but nonbinding. (*In re Alexandria P.* (2016) 1 Cal.App.5th 331, 347.)

*supra*, 226 Cal.App.3d at p. 668.) The reviewing court reversed the trial court, noting the father had some type of legal parenting relationship with the child and held that the trial court must comply with ICWA notwithstanding a parent's lack of recent physical custody of the child. (*Ibid.*) Thus, *Crystal K.* stands for the proposition the trial court must apply ICWA when a parent has established "some sort" of a legal relationship to his or her Indian child. (Accord, *Monroe County Dep't of Human Servs. v. Luis R.* (*In re Vaughn R.*) (Wis.Ct.App. 2009) 770 N.W.2d 795, 803 (*Vaughn R.*) [rejecting argument ICWA did not apply because the parent had not had physical custody of the child.) Thus, *Crystal K.* does not support the argument a parent can retain legal custody when the court has determined that continued custody of the child by the parent would damage the child. We could not locate any authority in a comprehensive review of state cases interpreting 25 U.S.C. section 1912(f) to support James's argument the court erred in terminating his parental rights by failing to consider whether termination of *legal* custody was necessary to prevent serious emotional or physical damage to Collin.

With the exception of cases in which the parent argued 25 U.S.C. section 1912(f) did not apply because the parent had not had physical custody of the child (see, e.g., *Crystal K., supra*, 226 Cal.App.3d at p. 668; *In re Vaughn R., supra*, 770 N.W.2d at p. 803; *In the Interest of W.D.H.* (Tex.Ct.App. 2001) 43 S.W.3d 30, 35 fn. 7; *In re Adoption of Baade* (S.D. 1990) 462 N.W.2d 485, 490), state courts have either explicitly or implicitly interpreted the phrase "continued custody" to include *both legal and physical custody*, or have applied it without distinguishing between legal and physical custody. (See, e.g., *D.J. v. P.C.* (Alaska 2001) 36 P.3d 663, 670 ["continued custody"

16

under § 1912(f) refers to legal custody as well as physical custody]; *In the Interest of C.A.V.* (Iowa Ct.App. 2010) 787 N.W.2d 96, 102 (*C.A.V.*) [explicitly defining "continued custody" to include both legal and physical custody]; *In the Matter of the Welfare of the Children of: S.R.K. and O.A.K., Parents* (Minn. 2018) 911 N.W.2d 821, 829-830 [applying "continued custody" without distinguishing between physical and legal custody]; see also *Adoption of Hannah S*. (2006) 142 Cal.App.4th 988, 994 [reversing trial court's decision that continued custody of the type sought by father, i.e., contact by mail or e-mail, and eventual visits in prison, would not result in serious emotional or physical damage to the child].)

Finally and significantly, in interpreting 25 U.S.C. section 1912(f), the Guidelines state, "the evidence must show *the existence of particular conditions in the home* that are likely to result in serious emotional or physical damage to the child . . . ." (Guidelines, at p. 52, italics added.) This advisory interpretation further supports our conclusion that the phrase "continued custody" does not refer solely (or alternatively) to legal custody, but refers to both legal and physical custody in making the finding required under 25 U.S.C. section 1912(f).[4] (*D.J. v. P.C., supra*, 36 P.3d at p. 670; *C.A.V., supra*, 787 N.W.2d at p.

_____

[4]     Distinguishing between legal and physical custody would result in anomalous results for a dependent child. For example, if the court determined beyond a reasonable doubt that continued physical custody would result in serious harm to the child, but did not make the same finding as to the parent's continued legal custody, the court would not be able to select a permanent plan of guardianship for the child because a guardian assumes both legal and physical custody of his or her ward. Under a plan of guardianship, "[t]he guardian assumes the care, custody, and control of the child" and "the authority of the parent 'ceases.' " (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1124, 1123.) While the court has discretion to grant visitation, parental rights are otherwise "completely suspended for the duration" of the guardianship. (*Id.*, at p. 1123-

102.) Thus, the trial court was not required to determine whether continued *legal* custody was likely to result in serious emotional or physical damage to the child.

We now turn to the issue whether the ICWA detriment finding is supported by substantial evidence. (*In re A.L.* (2015) 243 Cal.App.4th 628, 645; *In re Barbara R.* (2006) 137 Cal.App.4th 941, 951.) Under this standard, we review the entire record but do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if there is other evidence to the contrary. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves [the finding] beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

H.S. and James contend there is not substantial evidence in the record to support the ICWA detriment finding. They contend the evidence shows they had been safely

1124.) In such a case, the court would be required to select a permanency plan of long-term foster care. Of the permanency plan options available under the California dependency scheme, only a plan of long-term foster care would allow a parent to retain the right and responsibility to make decisions relating to his or her child's health, education, and welfare. (*In re Catherine H.* (2002) 102 Cal.App.4th 1284, 1289.)

We will not interpret "continued custody" to eviscerate the long-established goal of proving the benefits of a safe, stable, and permanent home to a child who cannot be safely returned to his parents' care. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "While the ICWA focuses on preserving Indian culture, it does not do so at the expense of a child's right to security and stability." (*In re D.S.* (Iowa Ct.App. 2011) 806 N.W.2d 458, 469, quoting *C.A.V., supra*, 787 N.W.2d at p. 104.)

18

caring for Collin's younger brother for more than a year, and H.S. had not used opiates for seven months. H.S. further contends she was not informed of Collin's therapy, medical, and education appointments, and would have attended them had she known of them. James states he participated in reunification services and there was no current evidence to show he had a substance abuse problem. The parents point out that the Cherokee Nation disagreed with the Indian expert's conclusion that custody of Collin by the parents was likely to result in serious emotional or physical damage to him. (§ 1912(f).)

We conclude there is substantial evidence to support the ICWA detriment finding. The record shows that the parents were addicted to opiates, did not believe that taking prescription medication was substance abuse, and did not understand the protective issues in the case. The record further shows that Collin had many special needs and that the parents did not address those needs by participating in or attending his many appointments for services, many of which were scheduled on a consistent, ongoing basis. The parents were unable to meet Collin's needs while he was in their care. They did not participate in his treatment services during the case. Collin experienced extreme behavioral problems. He needed focused attention and consistent parenting. James's parenting was inconsistent at times. He watched movies on his cell phone rather than engaging with Collin. Throughout the reunification period, H.S. and James continued to use opiates and did not participate in reunification services. As a result, their visitation with Collin was never expanded beyond supervised visits. Thus, there is a "demonstrated

19

correlation between the conditions of the home and a threat to [Collin's] emotional or physical well-being." (Guidelines, at p. 53.)

In addition, the juvenile court properly considered the parents' history of substance abuse. The court not only was required to consider the parents' current circumstances but was also required to assess those circumstances in view of their history to "evaluate the likelihood that [they] would be able to maintain a stable, sober and noncriminal lifestyle for the remainder of [Collin's] childhood." (*In re Brian R*. (1991) 2 Cal.App.4th 904, 918.) H.S. had a lengthy and significant pattern of seeking drugs by falsely claiming pain from various ailments, including a nonexistent brain tumor. The court also considered H.S.'s habitual dishonesty and James's denial of the severity of her substance abuse problem as well as his own continued opiate abuse. Each parent had resumed taking opioid medication after overdosing, H.S. several times. After reunification services were terminated, each parent tested positive for opioids at a level indicating abuse. James spent a night in the emergency room after his morphine levels were found to be in excess of 100,000 ng/dl, claiming he was suffering from food poisoning. The court did not abuse its discretion in discounting H.S.'s current claim of sobriety and James's assertion he was not abusing drugs because he was taking prescription medications, and byrecognizing that the parents' history of opioid addiction and ongoing denial of any problem presented a substantial risk of relapse, and therefore presented a threat to Collin's emotional or physical well-being. (Guidelines, at p. 53.)

We conclude the evidence amply shows a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child

20

will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding. (25 C.F.R. § 23.121.) There is substantial evidence to support the ICWA detriment finding. (§ 1912(f).)

## II

### A

#### *The Parties' Contentions*

H.S. and James contend the juvenile court erred when it determined the beneficial parent-child relationship exception did not apply. Each parent argues they proved both elements of section 366.26, subdivision (c)(1)(B)(i) by maintaining regular visitation and contact with Collin and showing he would benefit from continuing his relationship with them. H.S. asserts Collin developed a strong bond with her during his first 13 months and that bond was continued through regular and consistent visitation. She demonstrated a parental role and appropriate parenting during visits. In addition, the Indian expert concluded that Collin would benefit from continued visitation.

James contends there is no legitimate reason to order adoption instead of guardianship. He argues adoption by Grandfather would only confuse Collin. As the Indian expert recognized, adoption was not the preferred alternative plan because it would deprive Collin of the benefit of a continued relationship with his parents.

### B

#### *Relevant Legal Principles and Standard of Review*

At a permanency planning hearing, the court may order one of three alternatives— adoption, guardianship, or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289,

296-297.)  If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans.  (*Id*. at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.)  If the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  "Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship."  (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1315-1316.)  " '[B]enefit from continuing the . . . relationship' " means the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)  "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid*.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the

determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

C

*The Beneficial Parent-child Relationship Exception Does Not Apply*

H.S. contends she cared for Collin for 13 months and established a significant parent-child bond with him, and continued that bond through regular visitation and contact. We are not persuaded by her argument Collin had a beneficial parent-child relationship with her. The record shows that Collin became a dependent of the juvenile court because his parents had long-standing, significant problems with narcotics abuse that adversely affected Collin. When he was removed from his parents' care, Collin had unaddressed issues, including anemia, respiratory problems, eczema and allergies, hearing and speech deficiencies, hyperactivity, and sensory processing disorder. The social worker said Collin's special needs required the parents to remain sober.

Throughout the reunification period, H.S. did not demonstrate a commitment to Collin by participating in reunification services to overcome her addiction. At the time of the section 366.26 hearing, the parents had not made any significant changes to show they were committed to sobriety and could safely care for Collin. James never tried to stop using narcotics and did not participate in any treatment programs. H.S. continued to obtain narcotic medication, claiming she was in pain for previously undiagnosed chronic ailments. H.S. denied there were any protective issues that had necessitated Collin's removal and his continuation in out-of-home care.

In addition, the "benefit" prong of section 366.26, subdivision (c)(1)(B)(i) requires the juvenile court to assess whether the parent-child relationship would "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) The record shows the court did not abuse its discretion when it concluded that the continuation of the parent-child relationship did not outweigh the well-being Collin would receive from a permanent home with his Caregivers. At the time of the section 366.26 hearing, Collin was three years and three months old. He had been in the Caregivers' home for twenty-five months. Prior to his removal, Caregivers took care of Collin three to four times a week, including weekends, and took him to baseball games, the beach, the park, the zoo, Disneyland, and swimming. After Collin was removed from the parents' care, Caregivers made a tremendous effort to provide Collin with the services he required. The record shows that Collin displayed extremely challenging behaviors. His occupational therapist said Collin might need five to ten more years of therapy. Two years after Collin was removed from the parents' custody, H.S.'s therapist reported that H.S. had not informed her about Collin's special needs and she was therefore unable to fully assess whether H.S. was capable of caring for Collin and his younger brother. Prior to the dependency, and during the 25-month dependency, H.S. and James did not demonstrate an ability to regularly and consistently attend Collin's extensive appointments for supportive and remedial services, nor did they display an ongoing interest in his progress.

24

When a child is adoptable, there is a strong preference for adoption over less secure and stable permanent plans.  (*In re J.C.* (2014) 226 Cal.App.4th 503,528; *Jones T. v. Superior Court* (1989) 215 Cal.App.3d 240, 251.)  We reject James's argument that termination of parental rights would be detrimental to Collin because adoption by Grandfather would confuse him.  The record shows Collin has an established relationship with Grandfather, who has assumed full parental responsibility for him.  While Collin may not understand the changed legal status until he is older, we do not believe the continuation of his relationship with Grandfather will confuse him.  Their relationship is already parental in nature.

We conclude the juvenile court did not err in determining Collin would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents.  (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)  The record supports the findings Collin will not be greatly harmed by the loss of the parent-child relationship and that no exceptions to termination applied.  (§ 366.26, subd. (c)(1)(B)(i); *Autumn H.*, at p. 575.)

DISPOSITION

The findings and orders terminating parental rights are affirmed.


O'ROURKE, J.

WE CONCUR:


NARES, Acting P. J.


DATO, J.

26

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re COLLIN E., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D072988 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3941) |
| v. | |
| H.S. et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Appellants. | |

THE COURT:

The opinion in this case filed July 2, 2018, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing

27

on page 1 of said opinion be deleted and the opinion herein be published in the Official

Reports.

NARES, Acting P. J.

Copies to:  All parties