Filed 3/3/21  In re C.A. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. K.A., Defendant and Appellant. | G059464 (Super. Ct. Nos. 18DP1052, 18DP1053, 18DP1054) O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance by Minors.

\*        \*        \*

K.A. (mother) appeals from an order terminating her parental rights over her three children and finding they are adoptable and denying her Welfare and Institutions Code section 388 petition for return of the children.[1] She contends the court erred in three ways.

First, it denied a continuance of the section 366.26 hearing (.26 hearing) that mother had requested because she claimed to be ill on the day of the hearing. The court, however, did not believe mother's claim of illness. The visitation center called mother that same day and asked standard questions concerning COVID-19 symptoms, and mother denied all symptoms—the very same symptoms she claimed to have had to justify a continuance. The evidence supports the court's finding that mother was being deceitful.

Second, mother claims the court erred in concluding the two older children were adoptable. But substantial evidence supports the conclusion that the older siblings were intelligent and well-behaved and thus generally adoptable notwithstanding their age. Moreover, the maternal grandmother had already been cleared for adoption and thus they were also specifically adoptable. Mother's argument that the maternal grandfather had not yet been cleared for adoption is irrelevant because there is no indication that the grandmother would refuse adoption if the grandfather were not approved, and the older children had been living with both grandmother and grandfather during nearly the entire proceeding.

Third, Mother claims the court erred in not finding the parental-bond exception applied to prevent terminating her parental rights. But nothing in the record suggests the parent-child bond was so strong that terminating parental rights would harm the children, and thus the exception did not apply. Accordingly, we affirm the orders.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

FACTS

Unlike the prior appeal in this proceeding, which concerned only R.W., who was one year old at the time of detention, this appeal additionally concerns his two older half-sisters, who we refer to as the sisters throughout this opinion. S.W. (father) is the biological father of R.W. The sisters considered father their stepfather. Mother and father were not married, however, and their relationship had broken down to the point that, early in the dependency proceeding, a restraining order from a criminal court prevented the two from seeing each other, except to transfer the children to one another.

*Detention*

Mother has an extensive history of methamphetamine abuse and a related criminal history, which includes court-ordered substance abuse treatment. She had been arrested twice for driving under the influence of methamphetamine. Mother had enrolled in a drug rehabilitation program three times, in each case after she became pregnant.

Her most recent relapse began around December 2017, which is when father found methamphetamine in mother's glove compartment (for point of reference, the detention occurred in October 2018). Father observed that mother's drug abuse and mental health issues had substantially escalated in August and September of 2018, culminating in an incident in which mother, apparently out of a paranoid fear that father would kill her, planted drugs and drug paraphernalia in father's car, then called 911 in an attempt to frame him.

On September 17, 2018, mother was placed on a three-day involuntary psychiatric hold after abusing methamphetamine. She had been experiencing hallucinations and paranoia. She would wake the children up in the middle of the night and drive them to a motel or to a friend's house because she thought the house was not safe. This behavior continued in the days preceding the detention. Mother refused to

3

sleep at home, fearing there were people in the attic out to get her, and instead bounced back and forth between hotels and friends' houses with the children. This involved driving around with the children as late as 1:00 a.m. The 10-year-old sister reported she was not happy because she did not know where she would be sleeping each night. Father ignored them; mother was hearing voices.

Prior to the detention, the maternal grandmother told the assigned social worker that mother's substance abuse and mental health were getting worse. The maternal grandmother was frustrated and concerned for the children's lives. This sentiment was echoed by mother's friends. Mother's best friend told a social worker that she was concerned about the children because mother's paranoia and delusions had escalated in the previous four weeks. As reported by the social worker, the best friend "stated the mother 'continues to call me' and will say there is 'something in the backyard, someone running out of the house.' [The friend] stated she can hear the mother screaming at the kids and she tells [her] there is no need to scream." The friend described mother as "neurotic, frantic, and behaving with paranoid delusions." She added, "nothing she says makes sense, and the mother cannot be believed." Mother had showed up at the friend's house at 4:00 a.m. out of paranoid fear of her own home.

The maternal aunt had been living with mother the prior two years to ensure the children were cared for. However, the maternal aunt was moving out due to mother's combativeness while high on methamphetamine.

The older sister described their home as "sad." She reported that her life has "never been quite normal." However, she denied being abused or seeing domestic violence. She generally confirmed mother's constant paranoia. The middle sister also confirmed the late night escapes from the house to go either to a motel or to a friend's house. She described her mother as "cuckoo."

By the beginning of October 2018, The Orange County Social Services Agency (SSA) had determined that the chaos of the children's home warranted detaining

the children.[2]  It sought a protective custody warrant, which was granted.  Rather than turn the children over, however, mother grew angry and absconded with them.  She thought better of it a few days later and agreed to leave the children with a former caretaker.  The children were placed with the maternal grandparents.

*Jurisdiction/Disposition*

Mother denied she had any mental health problems, other than post-traumatic stress disorder, which she claimed was a result of an abusive relationship with her late ex-husband (the biological father of the two sisters).  While she admitted her history of methamphetamine use, she denied she had an unresolved problem, describing herself as "in recovery."  The social worker urged mother to begin a drug treatment program.  Mother demurred, however, stating that she could not afford to participate in an in-patient program, and that she had already completed out-patient programs.  She subsequently missed her intake interview for an out-patient program.  She finally started that process approximately a month and a half later.  She was also referred to random drug testing and was given instructions on where and how to test.  She missed her first eight tests.

Prior to the jurisdiction hearing, mother was arrested for possession of a weapon in a state or local public building (Pen. Code, § 171b, subd. (a)).  She pleaded guilty and was sentenced to 10 days in county jail.

Mother was offered visitation twice per week.  Her initial visitations generally went well, with the children enjoying the visit, though mother ended one visit early and had a habit of speaking poorly of the children's caretakers in the presence of the children.  Mother also began harassing the caretaker via text messages and phone calls.

---

[2]      Father was also experiencing substance abuse problems, though not to the same extent as mother.  He is not a party to this appeal, however, and thus is mentioned only where relevant to mother's appeal.

5

After approximately two months, the oldest child told the social worker that she felt uncomfortable with mother during the visits, though she did not elaborate on why. The children were doing well in the care of the maternal grandmother.

SSA recommended offering mother reunification services, despite that, in its view, mother was not legally entitled to such services.[3] The social worker elected to recommend reunification services because the children were bonded to mother, mother had previously shown an ability to achieve long-term sobriety, there were no prior child-abuse referrals, and mother's relapse may have been triggered by the death of her ex-husband.

In December 2018, the court found the allegations of the petition to be true and declared the children dependents of the court. The court adopted all of the recommendations of SSA, adding only that mother's drug testing be independent of her counseling, and that her counseling address the issues of domestic violence and her absconding with the children.

*First Reunification Period: January 2019 – June 2019*

Mother's case plan required her to participate in the following services: "Psychiatric/Psychological Evaluation, Psychotropic Medication Evaluation and/or Monitoring, General Counseling, Parenting Education Program, Substance Abuse

---

[3] The social worker who authored the jurisdiction/disposition report expressed the view that section 361.5, subdivision (b)(13) applied, which permits a court to bypass reunification services under the following conditions: "That the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

Testing, 12-Step Program, Substance Abuse Treatment." The social worker described mother's progress on her case plan during this period as minimal.

Regarding mother's required mental health treatment, she made no progress. Mother continued to deny she had any problems. She blamed everything on domestic violence, or on the maternal grandmother orchestrating a scheme of harassment against her. She asserted she was hospitalized for no reason. The Orange County Health Care Agency denied her specialized services, stating such services are not likely to help "due to [mother's] intake indicating denial of all major symptoms, behaviors, and impairments related to mental health." Mother made no further effort to follow up.

Regarding general counseling, mother did not return the calls or respond to letters sent to her from her initial referral, and thus, three months into the first reunification period, the initial referral was terminated. She finally got into counseling approximately five months into the first reunification period. Her attendance was good, and she was cooperative. However, mother was not acknowledging her own fault in causing the dependency proceeding. After the first six months she had attended a total of five sessions.

Mother made no progress on attending a parenting education class.

Mother was scheduled for 27 random drug tests during the six-month period. She had six negative tests, one test positive for methamphetamine, 19 missed tests, and one inability to provide a sample. She also drug tested through her perinatal program, which she attended for approximately three months. Through that program she tested negative twice, failed to appear 12 times, had four tests that were "adulterated/tampered/diluted," was unable to provide a sample twice, and tested positive for methamphetamine twice (once in February and another time in March). She came up with farfetched excuses for her positive tests, such as that she must have been exposed second-hand at a bus stop, or, in one case that she randomly found a crack pipe in her pillowcase at a motel.

7

The counselor at the perinatal program reported that mother was "struggling" and recommended an inpatient drug treatment program, to which mother falsely responded that the social worker was opposed to it (the social worker had, in fact, recommended it). Mother later explained she resisted an inpatient program because she did not want it to appear she was "jumping around" between different treatment programs. She eventually entered an in-patient drug rehabilitation program at the end of April 2019. She was kicked out four days later. The reason is not entirely clear in the record, but it appears she was attempting to take unauthorized pain medication and otherwise had medical issues that precluded her participation in the in-patient program. She did not reenroll in any sort of drug treatment program in the remainder of the first reunification period. She attended 12-step meetings with some regularity but never found a consistent sponsor.

In March 2019, mother threatened to kill the maternal grandmother if she relinquished R.W. to a different family. A couple of months later, mother trespassed onto the maternal grandmother's property and, during a nightly phone call with the older sister, asked for a plate of food, complaining that she was starving. The older sister took out a plate of food. The maternal grandmother was unaware of this until after the fact.

Regarding visitation, mother's attendance was "semi-consistent" and "appropriate for the most part." In February 2019, the older sister decided she did not want to be around her mother anymore and stopped attending the visits. While the visits were generally going well, mother would sometimes get into arguments with the maternal grandmother in front of the children. These arguments culminated in visitation being moved to a supervised visitation center.

Mother's living conditions were unstable during the first reunification period. She bounced around between friends' houses and motels.

The children continued to do well in the maternal grandmother's care. The older sibling reported that she wanted to live with her maternal grandparents

8

permanently. The middle sibling, though she felt comfortable with the maternal grandparents, "really misse[d] her mom." The maternal grandmother stated she was not willing to provide permanency for two-year old R.W., however, because of her advanced age and him being very active.

Toward the end of this reunification period, mother was arrested for possession of methamphetamine.

Notwithstanding mother's minimal progress by the end of the first reunification period, SSA recommended a second period of reunification services.[4] The court adopted SSA's proposed findings and recommendations.

*Second Reunification Period: July 2019 — January 2020*

Toward the beginning of the second reunification period, R.W. was removed from the maternal grandmother's care at her request and placed with a foster family.

Mother attended counseling during the second reunification period, but her counselor reported she "does not have much insight" into her role in losing custody of her children. Another therapist reported that mother's "mannerisms to me seem like she's under the influence." Through her counseling, she only drug tested twice, one of which, toward the end of the reunification period, was positive for methamphetamine.

Mother did not participate in any parenting classes.

Other than obtaining a prescription for depression, Mother made no progress on obtaining psychiatric care.

Regarding random drug testing, mother missed 26 out of 31 tests. Toward the end of the reunification period she tested positive for methamphetamine on two occasions. Midway through the reunification period she requested a drug patch, but then

---

[4]     It appears from the record that SSA was not aware of mother's recent arrest when it recommended continuing reunification services.

9

she made no effort to have it applied once it was approved. Although she claimed to be attending 12-step meetings, she had no proof of attendance. She claimed to have a sponsor, but the alleged sponsor could not even tell the social worker what step mother was on. She attended outpatient drug counseling for a couple of months but did not do any drug tests.

Mother's visitations were once again "semi-consistent" and generally positive. The older sister began attending visits once again. The only issue during visitation was that mother reported headaches and often feeling sick, requiring her to spend much of the time lying down.

Mother's compliance with her case plan was once again described as minimal. Consequently, SSA recommended terminating reunification services. Father, on the other hand, had made substantial progress on his case plan, and thus SSA recommended another six months of reunification services for him. The court agreed and terminated reunification services as to mother. The court extended reunification services to the father.

Mother appealed from the order terminating reunification services, but only as to R.W., not the two older siblings. In a prior unpublished opinion, we affirmed the court's order. (*In re R.W.* (Oct. 19, 2020, G058884).)

Leading up to the .26 hearing, which was initially scheduled for May 2020, SSA filed a report recommending that mother's parental rights be terminated and the two sisters be put up for adoption. That recommendation was based on the following facts. Both the caretakers and the school counselor reported the sisters were happy and well-behaved. Both sisters were getting high marks in school. Both sisters were healthy. The older sister "present[ed] as quiet, mature, and insightful." The younger sister "present[ed] as friendly, happy, and talkative." Both sisters were physically active and participating in "developmentally appropriate" activities.

10

As a result, the social worker opined that both sisters were generally adoptable. As to whether they were specifically adoptable, the adoptive grandmother successfully completed the resource family approval process and was committed to adopting them.

Both sisters expressed agreement to being adopted. In June 2020, a clinical psychologist conducted a preadoption evaluation report for each of the sisters. The older sister "stated that she enjoys living with her grandmother and her younger sister and looks forward to her legal adoption." The younger sister "shared that she enjoys living with her grandmother and older sister and wishes to be adopted." In July 2020, the social worker met with each sister individually to assess their feelings about terminating mother's parental rights and putting them up for adoption with their grandmother. The older sister was somewhat more hesitant in her feelings about the matter. The social worker explained, "She reported that she feels 'okay' about this but stated that she wishes the Court would allow the mother a little more time. The undersigned asked the child if she felt the mother was sober and she stated, 'No.' The child reported that she does not feel that the mother is in a state in which she could take custody of the children because 'she told me, [she] need[s] to find a new place.' She reported that the mother told her she could not stay where she was because the person she was living with is 'drama.'" The younger sister continued to express a desire to be adopted.

Mother continued visiting the children after services were terminated. Although the visits were generally appropriate, "mother ha[d] been observed to be falling asleep during some visits and leav[ing] the facility for 15-30 minute increments leaving the children in the supervision of Olive Crest staff." Moreover, by mid-July mother had 10 no-shows.

Around June 2020, mother completed a drug counseling program called KC Services. However, when the social worker contacted a counselor from KC Services, she reported that while mother had, in fact, graduated, she had missed nine out of 19 group sessions and two of the seven individual sessions. Of the four drug tests mother took, she

11

tested positive for methamphetamine once, but she was not required to test in the prior two months because of the COVID-19 pandemic. In February 2020, mother was charged with possession of methamphetamine, and then again in a separate incident in March 2020, she was cited for possession of methamphetamine.

The .26 hearing, which was also an 18-month review hearing pertaining to father and R.W., the youngest child, was continued to June 1, 2020. Prior to the rescheduled hearing, SSA changed its recommendation with respect to R.W. The new recommendation was that the court continue the hearing for 30 days to permit the father time to secure housing to start a trial with R.W. residing in father's custody for 60 days. The court granted that request and continued the hearing to June 30, 2020. Once that was in place, the .26 hearing was continued again to August 11, 2020, to coincide with the end of the 60-day trial period. After the 60-day trial period, SSA changed its recommendation to be that R.W. be returned to the custody of the father under a plan of family maintenance.

On August 11, 2020, Mother filed a petition under section 388 to change a court order; specifically, she sought an order returning the children to her care, or, alternatively, reinstating her reunification services. As to the circumstances that warranted the change, she stated, "I have completed my services through KC services on 5/29/20; I have continued to visit my children consistently. I have completed parenting." The court summarily denied the request, finding there was no evidence of a change in circumstances and that the request did not promote the best interests of the children.

At the hearing, mother's counsel declared an unresolvable conflict with mother, which the court accepted and relieved counsel. The court appointed a new attorney for mother and continued the hearing to September 4, 2020.

On August 14, 2020, the maternal grandfather told the social worker that he would like to become an adoptive parent as well. SSA began the process of reviewing him.

12

At the hearing on September 4, which was held via a video conference because of the COVID-19 pandemic, mother's counsel noted that mother was not present and requested a continuance. Counsel had spoken to mother that day, and mother claimed she was ill with "stomach pain, feverish and chills and was not going to be able to be present for today's proceeding." Mother had e-mailed photographs of herself allegedly at the Orange County Healthcare Agency for a doctor's appointment.

SSA opposed the motion. The social worker had called the phone number of where mother was supposedly attending a doctor's visit, but the office refused to say whether mother was there due to privacy regulations. Further, mother had an in-person visit scheduled for that day with the sisters at a monitoring agency. The monitoring agency called mother "[a]nd the monitoring service asked mom all of the screening questions: have you been feverish, had a headache, upset stomach, difficulty breathing, all of the Covid screening questions that they're required to do when they're going to have a visit, and mom denied having any such symptoms and confirmed her in-person visit for 6 o'clock tonight." SSA concluded mother was being dishonest, particularly in light of, from its perspective, "habitual dishonesty as far as mom is concerned." Minors' counsel and father's counsel both joined in SSA's opposition.

Ultimately, the court found mother lacked credibility due to her history of "less-than-truthful behaviors," her failure to produce any paperwork proving her illness, and her denial of the illness to the visitation center. The court denied the continuance. The court gave counsel 10 minutes to contact mother to testify by video conference. Counsel called and the call went to voicemail. Counsel left an urgent voicemail explaining the situation. Mother responded with an e-mail that she was with a doctor and could not answer her phone. Accordingly, the hearing proceeded without her.

No witnesses were called at the hearing. The court returned R.W. to father's custody under a plan of family maintenance. As to the older sisters, the court terminated mother's parental rights, found they were likely to be adopted, and ordered

13

adoption as the permanent plan. Mother appealed from the denial of her section 388 petition and the court's orders at the .26 hearing/18 month review hearing.

DISCUSSION

Mother raises three issues on appeal. First, she contends the court abused its discretion in denying the continuance. Second, she contends the court's finding that the sisters were adoptable was not supported by substantial evidence. Third, she contends the evidence compelled a conclusion that the parental-bond exception prohibited the court from terminating mother's parental rights. None of these contentions are persuasive.

*Denial of the Continuance*

Mother contends the court erred in denying her continuance because of her illness on the day of the .26 hearing. "Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing . . . ." (§ 352, subd. (a)(2).) "Continuances should be difficult to obtain." (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238, 1242.) We review a court's order denying a continuance for abuse of discretion. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 605.) The court did not abuse its discretion.

Mother argues that her illness compelled the court to grant the continuance. The court, however, did not believe her. It made an adverse credibility finding. That finding was plainly supported by the evidence: When the visitation center called mother, she had denied any symptoms *that very day*. We, of course, must defer to the trial court's credibility findings when supported by substantial evidence.

Mother also contends that "good cause for the continuance can be found in the fact that [the older sister], almost thirteen years old at the time, wanted to attend the

14

section 366.26 hearing and told her counsel this, as well as the social worker on several occasions, yet, she was not transported to the hearing, nor did the court inquire of her counsel as to her attendance." Section 349, subdivision (d), provides minors 10 years of age or older the right to attend the hearing. The older sister, however, was represented by counsel who was fully competent to represent her interests at the hearing. If the older sister had still wanted to attend the hearing, counsel was in a position to make that request. In any event, mother's request for a continuance was not based on the absence of the older sister, it was based on her alleged illness. Accordingly, there was no abuse of discretion.

*Adoptability*

Next, mother contends substantial evidence does not support a finding that the sisters were adoptable. In deciding which permanency option to select, "[i]f the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) "'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]'" [Citation.] All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) We review the court's finding for substantial evidence that could meet the clear and convincing evidence standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

Here, the evidence obviously supports the court's ruling because the grandmother was willing, able, and already cleared to adopt the sisters. Mother tries to introduce some doubt into that unassailable fact by noting that the grandfather had recently expressed a desire to adopt but had not yet been approved. But there is nothing in the record to suggest that grandmother's willingness to adopt was contingent on

15

grandfather's approval.  Beyond that, the sisters were intelligent, well-behaved, active, and, by all accounts, lovely children that weathered a difficult upbringing with remarkable resilience.  Even if the adoption with the grandmother somehow fell through, the characteristics of the children support the court's conclusion that they were adoptable. There was no error.

*Parental-bond Exception*

Finally, mother contends the evidence compelled the conclusion that her rights should not have been terminated under the parental-bond exception.

"At a permanency planning hearing, the court may order one of three alternatives — adoption, guardianship, or long-term foster care.  [Citation.]  If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans.  [Citations.]  If the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  [Citation.]

"An exception to termination of parental rights applies where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  [Citation.]  'Evidence of "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship.' [Citation.]  '"[B]enefit from continuing the . . . relationship"' means the parent-child relationship 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'  [Citation.]

16

"'We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.'" (*In re Collin E.* (2018) 25 Cal.App.5th 647, 663.) Because the burden of proof was on mother at trial, to succeed on appeal she must show that the evidence *compelled* a result in her favor, not merely supported it. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

She has not made that showing. Nothing in the record suggests the sisters would be greatly harmed by terminating mother's rights and being adopted by the grandmother. Leading up to the .26 hearing, the younger sister had consistently maintained that she wished to be adopted by the grandmother. The older sister had mostly maintained the same. Although the older sister expressed some hesitation, expressing that she was "okay" with terminating rights but wishing the court would give mother "a little" more time, there was nothing to suggest the termination of mother's rights would substantially harm the older sister. Indeed, it was the older sister who refused to attend visitations with mother for a substantial period during 2019. And even closer in time to the .26 hearing, when asked how visitations were going, the older sister responded with a humdrum "okay." More generally, both sisters were thriving under the care of the grandmother, and the permanency associated with adoption outweighed any benefit to retaining mother's legal rights as a parent.

17

DISPOSITION

The postjudgment orders are affirmed.


                                 IKOLA, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.

18