Filed 12/30/20  In re J.C. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | B305197 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Petitioner and Respondent,<br><br>v.<br><br>JONATHAN C.,<br><br>Objector and Appellant. | (Los Angeles County Super. Ct. No. DK23137) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

Jonathan C. (Father) appeals after the juvenile court terminated his parental rights over three-year-old J.C. under Welfare and Institutions Code[1] section 366.26.  Father contends the trial court erred in not finding an exception to termination of parental rights as described in section 366.26, subdivision (c)(1)(B)(i).  We conclude the court properly applied the statute and therefore affirm.

## STATEMENT OF FACTS

Three-month-old J.C. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in May 2017 when J.C.'s teenaged uncle reported that J.C.'s maternal grandmother conducted drug transactions behind the family home, provided drugs to J.C.'s mother (Mother), argued with Mother, and chased Mother with a hammer.[2]  J.C.'s uncle also reported Mother used drugs during her pregnancy and was not taking proper care of J.C.

A DCFS social worker visited the home and learned from J.C.'s maternal great-grandmother that Mother, who had been staying at the home for a short period of time, would often leave J.C. with his great-grandmother without asking or otherwise providing for his care.  Mother revealed she had an open investigation in Orange County regarding allegations she was using drugs and neglecting J.C.  She admitted that, if she were tested for drugs, the results would be positive as she smoked marijuana and had recently used methamphetamine.

---

[1] All unspecified statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

On May 26, 2017, DCFS served Mother with a removal order for the baby. Mother told the social worker she did not know who or where J.C.'s father was and did not want him involved in the case. Mother, however, previously identified Father as J.C.'s biological father in the Orange County investigation. The social worker located Father in a maximum security jail complex in Orange, California, following his conviction of second degree robbery and receipt of stolen property. Father told the social worker he was not listed as the father on J.C.'s birth certificate and was not certain he was J.C.'s biological father.

DCFS filed a section 300 petition on J.C.'s behalf on June 1, 2017, alleging Mother's substance abuse and mental and emotional problems rendered her incapable of providing regular care and supervision for J.C.

Father was not present for the detention hearing, at which time the juvenile court made a prima facie finding that J.C. was a child described by section 300 and ordered him detained. Father was granted monitored visitation.

At the arraignment hearing the following week, Father was present and requested a finding of paternity. The juvenile court deferred the issue of paternity, ordered DCFS to investigate a possible placement of J.C. with Father, and ordered monitored visitation for Father twice a week for two hours per visit.

At the adjudication hearing one month later, the court found the allegations in the section 300 petition regarding Mother to be true and maintained the detention and visitation orders in effect.

Father was present at the disposition hearing on August 18, 2017, at which time the juvenile court found him

to be J.C.'s presumed father and, over the objection of DCFS, released J.C. to Father, who was 19 years old at the time. The court ordered family maintenance services and ordered Father to submit to 10 random or on demand drug tests, participate in Alanon, complete parenting classes, enroll in individual counseling (including for drug and alcohol issues), and comply with all criminal court orders.

In February 2018, DCFS reported that Father and J.C. lived in the home of Father's adoptive parents along with the paternal uncle, all of whom offered their support in caring for J.C. J.C.'s paternal grandmother drove Father and J.C. to various appointments and babysat for the child. The social worker noted J.C. appeared to be attached to Father and was comfortable in his care, and the paternal grandfather reported that, while he initially doubted Father's ability to become a competent parent at such a young age, he was "surprised at the person Father ha[d] grown into."

Nonetheless, despite apparent strides made in parenting, Father was not in compliance with his case plan during this period. Although he completed a course of instruction in effective parenting and attended to his criminal court obligations, he missed several drug tests and had not yet participated in individual counseling or Alanon.

Father's situation quickly devolved. On May 23, 2018, he was arrested and incarcerated for violating the terms of his probation when he failed to participate in his drug treatment program and tested positive for methamphetamine on at least three occasions. Father admitted to using methamphetamine twice, once after "beating another (criminal) case" and again prior

4

to a court hearing because he "got a little nervous."  He consented to J.C.'s detention in the paternal grandparents' home.

DCFS filed a section 342 petition on July 6, 2018, alleging that Father's history of substance abuse and current use of methamphetamine posed a risk of serious physical harm to J.C. under section 300, subdivision (b)(1).  DCFS further alleged that Father was arrested for violating the terms of his criminal probation, and he failed to participate in his court ordered case plan in the instant case.

By September 7, 2018, Father had been released from prison and was enrolled in a residential treatment program. A staff member advised Father's social worker that he " 'has not been doing too well in the program.  He has a really bad attitude.' "  The staff member was also concerned about Father's honesty, as he claimed a number of medical "emergencies" that purportedly required him to leave the facility, but instead of seeking medical assistance, he spent the time away from the house with his girlfriend.  Father also sought and was granted permission to leave the house to appear at a court hearing that, according to the record, he did not attend.

The juvenile court sustained the allegations in the section 342 petition, ordered reunification services for Father, and granted him twice-per-week monitored visits with J.C.

Six months later, DCFS noted in its status review report that Father regularly visited J.C. at the paternal grandparents' home.  The paternal grandfather reported that, during the visits, which varied in duration from quick drop-ins to two hours or longer, Father interacted with J.C., made the child snacks, and supervised him while he played.

5

Although Father submitted to three negative drug tests in October and November 2018, he was a "no show" for another 13 tests between November 2018 and February 2019. He was on a waiting list to enter a sober living facility. The case worker also noted it was difficult to schedule face-to-face meetings with Father because he would not return calls. He also failed to attend a Child and Family Team meeting in January 2019 with the paternal relatives. At that meeting, Father's family advised DCFS that the plan was for J.C. to live with the paternal aunt and her husband should Father not reunify with his son. At a subsequent meeting that Father did attend, he agreed to the plan.

Prior to a six-month review hearing on April 15, 2019, Father provided proof of completion of a drug and alcohol treatment program between July and October 2018. He reported that he was enrolled in after care and was required to continue to submit to drug tests. At the hearing, the juvenile court agreed Father had made partial progress toward alleviating or mitigating the causes necessitating placement and ordered reunification services to continue.

Shortly thereafter, the facility through which Father was purportedly receiving after care reported it did not actually provide after care services and that he had not drug tested there or been in contact since he finished his treatment in October 2018.

In July 2019, DCFS reported that J.C. had adjusted well to living with the paternal aunt and uncle. Father was then residing at the paternal grandparents' home while working, participating in his court-ordered programs, and regularly visiting J.C. Father had submitted to six out of 12 drug tests

since the prior court hearing, all of which were negative. He failed to appear for the remaining six tests. He provided DCFS with proof of completion of phase one of a treatment program. DCFS was assisting him with housing and recommended in its report that family reunification services continue.

After learning, however, that Father had relapsed with alcohol, missed another drug testing appointment, and only attended two individual counseling sessions, DCFS recommended the following month that the court terminate his reunification services: "DCFS acknowledges that the father has a bond with the child [J.C.] and is now addressing his [c]ourt orders. However, in review of the life of this case, this family has been provided [f]amily [r]eunification [s]ervices for over 12 months. Father is in partial compliance in that[,] although he has completed [the first phase], he will require 16 more weeks to complete his outpatient program. [DCFS] continues to be concerned about the father's level of commitment to his sobriety. Given [the] father's history of drug use, his relapse in May, and the fact that [the] father has only attended two sessions of individual therapy in 12 months, it is imperative that [the] father address his underlying need to use methamphetamine."

At the September 5, 2019 contested section 366.21, subdivision (f) review hearing, a social worker testified that Father's visitation with J.C. was not as consistent as had been reported to DCFS. Father had told the paternal aunt (his sister) to report that he was regularly visiting his son when he was not doing so. The juvenile court noted that Father had received one year of family maintenance and reunification services, but still was "not ready to receive him at this time. No one is claiming . . . , not even Father, that he's ready to parent this child

7

and I don't think he is." The court terminated Father's reunification services, finding that the progress he made was not significant enough and returning J.C. to him would create a substantial risk of detriment to the child's well-being.[3]

Five months later, DCFS reported that J.C. remained safely and happily in the home of the paternal aunt and uncle, who wanted to adopt him. Father continued to visit the child, but the paternal relatives indicated he was "visiting minimally." A social worker reported the putative adoptive parents loved J.C. and shared a close bond with him. The social worker observed the child to be comfortable in their care, and also observed J.C. to be bonded to the putative adoptive parents, who he called "Mom" and "Dad."

At the February 6, 2020, permanency planning hearing, Father testified that he would visit J.C. once or twice a week; he was not allowed to have overnight visits and had to return the child to the caregivers at the end of the visits. He stated the two would spend time at the park, during which time J.C. would call him "Dad or Daddy." J.C. was always excited to see his father at the start of the visits and would cry at the end. On cross-examination, Father admitted he was not involved in J.C.'s medical care, did not know the name of his son's primary

---

[3] Father filed a section 388 petition on January 6, 2020, requesting reunification services be reinstated as he was participating in a treatment program that provided group therapy, individual counseling, drug testing, 12-step meetings, and a sponsor. The juvenile court denied the petition, finding it did not state a change in circumstance and the proposed change to the order would not be in J.C.'s best interests. He did not appeal that order.

8

physician, and was not informed when J.C. had medical appointments.

When asked what he wanted the juvenile court to do, Father replied that he wanted more time "[j]ust to figure everything out." Father's counsel argued Father's visits with J.C. had been consistent and that J.C. "recognizes Father as Father [h]as testified, and a bond between Father and [J.C.] would be in the best interest for [J.C.] to continue." Father's counsel asked the court to apply the section 366.26, subdivision (c)(1)(B)(i) exception, to not terminate his parental rights, and to order J.C. into legal guardianship instead of adoption.

The court found by clear and convincing evidence that J.C. was adoptable. The court determined that although there was a bond between Father and J.C., the relationship between father and son was outweighed by the benefit J.C. would receive through the permanency and stability of adoption. The court found that Father had not met his burden to apply the exception to adoption and terminated parental rights over J.C.

Father appealed.

## DISCUSSION

On appeal, Father contends the juvenile court erred in terminating his parental rights because the evidence established his relationship with J.C. outweighed any benefit the child would receive through adoption. We disagree.

At a permanency planning hearing held in accordance with section 366.26, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child who has been unable to reunify. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 103.) "When reunification efforts with a parent fail, as they did in this case, the focus shifts from family

9

preservation 'to the needs of the child for permanency and stability.' " (*Ibid.*; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Thus, permanency planning hearings are "designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53.)

At a permanency planning hearing, the court may order one of three alternatives—adoption, guardianship, or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296–297.) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297.) Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds "a compelling reason for determining that termination would be detrimental to the child [where] . . . [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The burden is on the party seeking to prove the exception. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)

" 'We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.' " (*In re Collin E.* (2018) 25 Cal.App.5th 647, 663.)

Here, the record reveals that Father's visitation with his son was not consistent even when he was not incarcerated, and, although his childcare skills on those occasions when he did visit

10

were often commendable, particularly for a parent so young, he continued to have substance abuse issues.

On appeal, however, Father is essentially silent on the topic of his methamphetamine and alcohol use, preferring instead to focus on the efforts he made to reunify with his son. But we cannot ignore that during the year-long reunification period, Father did not demonstrate a commitment to J.C. by meaningfully participating in services to overcome his addiction. Only eight months after J.C. was first released to Father's care, Father was arrested and incarcerated for violating the terms of his probation and testing positive for methamphetamine. He failed to complete the vast majority of his court-ordered drug tests—13 out of 16—between November 2018 and February 2019. He attended only two sessions of individual therapy in 12 months, thus evidencing a disregard or inability to "address his underlying need to use methamphetamine."

Father asserts that, "despite [J.C.] being moved to the paternal grandparents or the parental aunt, the relationship between [them] continued to grow" as they would "visit twice per week for six hours." But the evidence is less positive, indicating that Father "visit[ed] minimally" while J.C. was in the care of his paternal aunt and uncle.

All of these considerations weigh against a finding of a beneficial parental relationship. (*In re Collin E.*, *supra*, 25 Cal.App.4th at p. 664 ["the 'benefit' prong of section 366.26, subdivision (c)(1)(B)(i) requires the juvenile court to assess whether the parent-child relationship would 'promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents' "].) Although we do not question that Father

11

and J.C. had a close and loving relationship, J.C. exhibited the same attachment to his paternal aunt and uncle, who he called "Mom" and "Dad." The exception does not permit a parent who has failed to reunify with an adoptable child to "derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

The court did not abuse its discretion. The benefit of a stable, permanent adoptive home for J.C. outweighed the benefit of a continued relationship with Father, who, despite his partially successful visitation record, made insufficient progress toward overcoming his substance abuse problems leading to J.C.'s dependency. This is not the extraordinary case where an adoption should have been foreclosed by the exception provided in section 366.26, subdivision (c)(1)(B)(i).

## DISPOSITION

The juvenile court order is affirmed.

NOT TO BE PUBLISHED.

ROTHSCHILD, P.J.

We concur:

CHANEY, J.

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.