Filed 3/1/23  In re Rogelio O. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ROGELIO O. et al., Persons Coming Under the Juvenile Court Law. | B320698 consolidated with B320696 (Los Angeles County Super. Ct. No. 20CCJP05309) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ROGELIO O., Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

Rogelio O. (Father) appeals the juvenile court's finding that the facts before it did not support application of the sibling exception[1] to termination of his parental rights over the youngest of his three children, and its order of a permanent plan of adoption for that child. Father contends that termination of his parental rights will substantially interfere with the relationship between that of his youngest child, Rogelio O. (Roger)[2] (born in 2013), and sister Itzel O. (born in 2005), who is seven-and-one-half years older than Roger. Father further argues the juvenile court erred in finding the benefits adoption would provide Roger outweighed the benefits from continuing this sibling relationship.

As explained below, we disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Lorena E. (Mother) have three children: Marilyn O. (born in 2004), Itzel, and Roger. Mother is not a party to this appeal. As the issue in this appeal centers on the

_____

[1] See Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(v). Further unspecified statutory references are to the Welfare and Institutions Code.

[2] The child's given name is Rogelio, but he refers to himself as Roger as do others, including his family. We accordingly use the name Roger when discussing him.

2

relationship between Roger and Itzel, we focus our description of the facts and procedural history accordingly.

## A. Prior Dependency History and Referral Leading to Detention

Before 2020, the family had multiple prior dependency cases involving domestic violence and alcohol abuse by both Father and Mother. In connection with the last of these matters, Father was awarded sole legal and physical custody of all three children in January 2020.

On October 5, 2020, the Los Angeles County Department of Children and Family Services (DCFS) received a referral reciting aspects of the family's past history with DCFS, stating that Father had been deported to Mexico, that Mother was living separately from the children and unable to care for them, and that one of the relatives who had been caring for the children in the United States had just been arrested.

During investigation of the referral, Marilyn told a DCFS social worker that the children moved from California to Mexico in December 2019. All three children stated that while in Mexico, Father physically abused them, failed to provide them with life necessities such as food, and continued to abuse alcohol. The children stated that Father would not work and would panhandle for money; the money he did receive was used to purchase alcohol instead of food for the children. Father also sold the children's cell phones, clothing and other items to buy alcohol. Sometime in late June or early July 2020, the children went to live with their maternal grandmother in Chihuahua, Mexico. Marilyn estimated they were there for about three weeks when Father accused the maternal grandmother of kidnapping the children and called Mexican law enforcement. In August 2020,

the children returned to the Los Angeles area with two adult maternal half-siblings and began living in the half-siblings' home. However, the half-siblings could not regularly care for the children based on one working far from home and the other being arrested and ultimately incarcerated. Marilyn stated she and her siblings had not attended school since they left to live with Father in Mexico.

## B.  Detention Hearing and Subsequent Investigation

On October 7, 2020, DCFS filed a section 300 petition alleging the children were at substantial risk of suffering serious physical harm based on Father's physical abuse of them when they lived with him in Mexico as well as the parents' respective alcohol abuse issues. On October 9, 2020, the juvenile court held a detention hearing. The court ordered the children detained and placed in foster care, with monitored visitation to the parents. The court noted Father was in Mexico and therefore his visits would have to be telephonic. Following the detention hearing, the children were placed with three different foster families. Roger was placed with two caregivers who had cared for him during prior dependency court cases.

Father contacted DCFS the day after the detention hearing. Father accused maternal grandmother of kidnapping the children and denied any allegations of physical abuse or failure to feed the children, but did state sometimes there was not enough money to buy food. Father claimed an investigation conducted in Mexico concluded the children were making false allegations against him. Father also denied he ever consumed alcohol excessively. Father said that maternal grandmother eventually released the children to an adult sibling who brought the children to the United States without Father's consent.

4

Father stated he was aware the children were not happy in Mexico and did not want them returned to him in Mexico.

In a November 2020 jurisdiction/disposition report, DCFS reported that the children were interviewed that month. The children confirmed that Father drank excessively and had abused them, and that the children were scared of Father. Itzel reported she did not want to return to Mexico with Father and wanted her caregiver to adopt her. Roger also stated he wanted to stay with his caregivers and did not want to go back to Mexico. The report also stated Father remained in Mexico and had not had any contact with the children.

In a December 2020 supplemental jurisdiction/disposition report, DCFS reported that Father remained in Mexico. Father continued to deny any mistreatment of the children, insisted Mother and the maternal grandmother coached the children to make false allegations, and again claimed an investigation by Mexican authorities showed the allegations were untrue. Father admitted to occasional alcohol use, but said he was not an alcoholic.

Father reported that he was willing to comply with DCFS and court orders to get the children back. Father stated his intent to cross the border. Father said that, once he was in the United States, he planned to pick up Roger and take Roger back to Mexico because Roger wanted to be with Father. Father stated he was willing to leave Marilyn and Itzel behind if they were not willing to go back to Mexico with him, but that his desire was to take all three children with him. Father said he did not want to stay in California because he feared being deported and leaving his children behind, and that was why it was best for his children to be with him in Mexico.

In a February 1, 2021 last minute information (LMI) for the court, DCFS reported that throughout their various interviews the children had consistently stated they were victims of physical abuse, emotional abuse and general neglect by Father while in Mexico. DCFS indicated it had contacted the relevant Mexican authorities to follow up on Father's claims about the investigation there. DCFS obtained documents that included orders for the children to reside with maternal grandmother during the investigation of the children's allegations, signed interview statements demonstrating Father's substance abuse and physical abuse toward the children made by the maternal grandmother and her male companion, psychological interviews of the children showing consistent statements regarding Father's physical and emotional abuse, Father's withdrawal of his petition alleging the children had been kidnapped, and a final assessment recommending Father complete an anger management/parenting class before the children were returned to his care. DCFS reported the children expressed being fearful of Father and wished to remain in foster care rather than going back to live with Father. Marilyn and Itzel stated they no longer wished to reunify with either parent and did not feel their parents could provide them with a safe home.

In two March 2021 LMIs, Roger's caregivers reported that he was doing well in their home overall. Roger was very active physically and enjoyed outdoor activities, but was struggling with online learning (due to school closures based on the COVID-19 pandemic). Roger had demonstrated some aggressive behavior towards other children in the home, and was working with the wraparound team to reduce these outbursts. Itzel's caregiver reported Itzel was doing well in her home overall. However, Itzel

6

experienced some school-related anxiety and engaged in defiant behavior that included refusing to participate in online learning, leaving the home for a few hours without telling anyone, and saying she did not want to participate in wraparound services. To help Itzel, the caregiver said she was looking to provide Itzel with Intensive Services Foster Care (ISFC) mental health services.

## C. Jurisdiction and Disposition Hearings

On March 22, 2021, the juvenile court held a jurisdiction hearing. Father, who at this point was in the United States but in federal immigration custody, appeared telephonically. The court sustained the section 300 petition in its entirety and assumed jurisdiction over the children pursuant to section 300, subdivisions (a), (b)(1), and (j).

On April 20, 2021, the juvenile court held a disposition hearing. The court ordered the children removed from the physical custody of both parents, denied both parents family reunification services, and set a selection and implementation hearing pursuant to section 366.26.

In August 2021, DCFS reported on the living situations of Roger and Itzel. Roger continued to live with his caregivers. The caregivers were providing the child with a loving and supportive living environment, and were meeting the child's educational, development, and emotional needs, which included being trained to become an ISFC home if Roger was eligible for ISFC mental health services. DCFS observed Roger to be comfortable in the caregivers' presence, as evidenced by him smiling with them, responding positively to their directions, and calling them "mom" and "dad." Roger wanted to be adopted by the caregivers, and the caregivers in turn were dedicated to providing Roger with

7

stability and permanency through adoption. Although the caregivers were unable also to adopt Marilyn and Itzel, they were willing to facilitate continued visits between Roger and his siblings if parental rights terminated and they became Roger's adoptive parents. During the review period, the children had visits together as arranged by their caregivers. One such visit occurred in July 2021, when Roger celebrated his eighth birthday by having a party at a local park. Marilyn and Itzel attended the party, and Roger said he enjoyed seeing them there.

Itzel continued to live with her own caregiver. Itzel reported to DCFS that she was happy and comfortable in the home, but did not want to be adopted or placed under a legal guardianship. Instead, she wanted "to stay in her placement home just as things currently are." Marilyn, who was nearly 17, also wished to remain in foster care until she turned 18 instead of a legal guardianship or adoption.

## D.    Father's Section 388 Petition

On January 20, 2022, Father filed a section 388 petition requesting the juvenile court return the children to his physical custody, grant him family reunification services, and/or grant him unmonitored visitation with the children. The court subsequently ordered an evidentiary hearing on Father's section 388 petition.

## E.    Developments Before the Section 388 and Section 366.26 Hearings

In February 2022, DCFS provided an interim report on the family's current circumstances. Roger continued to live with the same caregivers, to whom he had grown very close over the past 15 months. The caregivers continued to commit to adopting Roger if parental rights terminated. Roger identified his

8

caregivers as his "parents" and said he wanted to be adopted by them; he identified Father as his "dad" and as a "friend" who was "fun to see." Roger agreed to continued visits with Father so long as Itzel or someone else was also present. The caregivers reported that Roger began exhibiting increased anxiety and sleeping difficulties after learning Father was released from federal detention in December 2021. When asked why he did not feel comfortable being alone with Father, Roger replied, " 'Because I want to be safe and as long as my sister is there I will be safe. I am scared that he will take me if I am alone.' "

Itzel likewise continued to live with her caregiver. When asked with whom she ideally would want to live, Itzel replied she could not think of anyone and that "I am not really close to anyone." Itzel said she was having hourly visits with Roger once every two weeks but wished she "could see him a lot more." Itzel also said she did not want Roger to be adopted because she believed that would make it more difficult for her to see him.

In May 2022, DCFS again reported on the family's current circumstances. Roger was having monitored visits with Father every other week; Itzel also attended these monitored visits. Itzel sometimes took on a "motherly role" during visits, such as making sure Roger ate his meal before dessert and was respectful toward Father. Roger told Itzel that she had "a friend in him" after Itzel said she did not have any friends at her school. In an interview with a DCFS social worker, Roger said that he only felt comfortable visiting Father if Itzel was also there. Roger identified his caregivers as the people with whom he would want to talk if he had a "good day" or a "bad day." When asked with whom ideally he would want to live, Roger said his caregivers, who he referred to as his "mom" and "dad."

In mid-May 2022, DCFS reported that Father tested positive for methamphetamine and amphetamine in March 2022 and was thereafter terminated from his substance abuse treatment program. After a monitored visit with Itzel and Roger in May 2022, Father told the DCFS social worker who had monitored the visit that he was planning to move out of state. Father said this was necessary because he had been "receiving threats for things he did in the past" and that he believed the children were in danger if he continued to have contact with the children.

## F. Section 388 and Section 366.26 Hearings

On May 17, 2022, the juvenile court held evidentiary hearings on Father's section 388 petition followed by a section 366.26 hearing to select Roger's permanent plan. Father testified in support of his section 388 petition as well as his position concerning Roger's permanent plan under section 366.26. Counsel for DCFS and the children asked the court to deny the section 388 petition. Based on the evidence presented, the court denied the section 388 petition, finding that Father failed to show a change of circumstances or that the relief requested by Father was in the children's best interests.

The juvenile court then turned to the section 366.26 hearing. Counsel for DCFS and Roger both asked the court to find that Roger was adoptable and no statutory exception to the legislative preference of adoption applied, and to terminate parental rights. Counsel for DCFS argued that the court should not apply the sibling relationship exception. Counsel for DCFS contended that despite Roger and Itzel having a positive relationship with one another, there was evidence that visits between the siblings were likely to continue (and thus there

would be no substantial detriment to their relationship if Father's parental rights were terminated) and the permanent plan of adoption was in Roger's best interests. Roger's counsel joined in these arguments, and additionally proffered that she had spoken with Roger's caregiver, who "confirmed she will support [Roger] and will continue to allow him to . . . have visitation with his siblings."[3]

Itzel's counsel stated Itzel was opposed to Roger being adopted and that the evidence showed Itzel and Roger would continue to benefit from having a sibling relationship. Father's counsel likewise asked the court to find the sibling relationship exception applied and to order a permanent plan for Roger that did not involve adoption.

In ruling, the juvenile court terminated Father's parental rights as to Roger based on its findings that the child was adoptable and no statutory exception to adoption applied. The court found "There's clearly a bond between [Roger] and his siblings, and we would not want to do anything that's going to cause substantial interference with that relationship." The court declined to apply the sibling relationship exception to adoption, finding that "there would not be substantial interference with the relationship between [Roger] and his siblings given the statements that [the court had] heard," and that "any risk of loss of ongoing contact between [Roger] and [Itzel] [is] outweighed by the long-term benefit that he would receive through the permanency and stability of adoption." The court designated Roger's caregivers as the prospective adoptive parents, stating

_____

[3] Father's counsel did not object to this proffer at the time it was made but did object later after the court had already ruled.

Roger had lived with them for over six months, the caregivers had expressed a commitment to adoption, and they had taken at least one step to facilitate the adoption process.

Father timely filed separate notices of appeal from the section 388 and section 366.26 hearings, one as to Marilyn's and Itzel's dependency cases, and one as to Roger's dependency case. We consolidated the appeals for purposes of briefing and decision.

## DISCUSSION

Father's appellate briefing addresses only the juvenile court's rejection of the sibling relationship exception as to Roger at the section 366.26 hearing. Accordingly, we treat the appeal from the denial of the section 388 petition as forfeited. (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "].)

## A.    The Applicable Law and Standard of Review

"[T]he goal at the section 366.26 hearing is '. . . to select and implement a permanent plan for the child.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 630.) At that hearing, "the court may order one of three alternatives—adoption, guardianship, or long-term foster care. [Citation.] If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans." (*In re Collin E.* (2018) 25 Cal.App.5th 647, 663.) There are statutory exceptions to this "strong preference" if a parent can demonstrate that termination of parental rights would be detrimental to the child for any one of several statutorily enumerated reasons. As relevant here, the sibling relationship exception applies when a court concludes "There would be

12

substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

When addressing this exception, the "juvenile court 'is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship.' " (*In re D.O.* (2016) 247 Cal.App.4th 166, 173.) "The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*Id*. at p. 174.) "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.)

" '*If* the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption.' " (*In re D.O.*, *supra*, 247 Cal.App.4th at pp. 173-174.) "[E]ven if a sibling relationship exists that is so strong that its severance would cause the child detriment," that is not the end of the analysis; the court must then "weigh[ ] the benefit to the child of continuing the sibling

13

relationship against the benefit to the child adoption would provide." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 952-953.)

Because of "the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.'" *(In re Celine R.* (2003) 31 Cal.4th 45, 61.) The parent advocating for the sibling exception bears the burden of proof to show it applies. (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 949.) A juvenile court's finding that the sibling relationship exception applies "will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

"[W]e apply the substantial evidence standard to the juvenile court's underlying factual determinations." (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 174.) But, "When the juvenile court finds the parent has not established the existence of the requisite beneficial relationship, [this court's] review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. [Citations.] When the juvenile court concludes the benefit to the child derived from preserving the sibling relationship is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, [this court] review[s] that determination for abuse of discretion. [Citations.]" (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 782.) Finally, "we review the lower court's ruling, not its reasoning" and "may affirm that ruling if it was correct on any ground. [Citations.]" (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 38.)

**B.    Substantial Evidence Supports the Juvenile Court's Finding that Termination of Father's Parental Rights Would Not Substantially Interfere with the Relationship Between Roger and Itzel**

The juvenile court found that while there was "clearly a bond between [Roger] and his siblings," "there would not be substantial interference with the relationship between [Roger] and his siblings" from termination of Father's parental rights. Father argues for a substantial evidence standard of review, and argues substantial evidence does not support this finding. In particular, he focuses on a representation made by Roger's counsel that Roger's caregiver would continue to allow visits with Roger's siblings. Father argues this unsworn statement was not evidence, and that there was no other substantial evidence—that is, evidence which is reasonable in nature, credible, and of solid value—supporting the juvenile court's finding. (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298 [defining substantial evidence].)

DCFS argues the juvenile court's finding that there would not be substantial interference in Roger's sibling relationship with Itzel if Father's parental rights were terminated constituted a determination that Father had failed to establish the existence of a beneficial sibling relationship between Roger and Itzel. Therefore, in the view of DCFS, the juvenile court found Father did not meet his burden of proof and Father must establish on appeal that "the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 782.)[4]

---

[4] Father asserts that DCFS should be judicially estopped from arguing Father failed to prove a beneficial sibling

15

It is unclear whether the juvenile court found Father had failed to establish a beneficial relationship between Roger and Itzel. The juvenile court stated, "[t]here's clearly a bond" between Roger and Itzel, and that it "would not want to do anything that's going to cause substantial interference with that relationship." While the court did not specify the nature of the "bond," its statement that it did not want to substantially interfere with that "bond" could suggest it believed the bond was significant and beneficial enough that it should be preserved if possible. On the other hand, the court found that termination of Father's rights would not substantially interfere with the relationship between Roger and Itzel, which suggests the juvenile court did not think the bond was so significant and beneficial that it necessitated preservation.

Given this ambiguity, we adopt Father's proposed standard of review and consider whether substantial evidence supported the juvenile court's findings. Setting aside the proffer from Roger's counsel about the caregivers' willingness to continue to facilitate visits with Itzel, admissible evidence in the record

relationship between Roger and Itzel because it took a contrary position before the trial court. We disagree DCFS has taken inconsistent positions. Before the juvenile court, DCFS acknowledged "there is a positive relationship" between Roger and Itzel, and argued termination of Father's parental rights would not substantially interfere with the sibling relationship. A "positive" sibling relationship is not the same as a relationship that is "sufficiently significant to cause detriment on termination." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 952.) Where "the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*Ibid.*)

16

established that Roger's prospective adoptive parents were open to continuing the sibling relationship through visits after Father's parental rights were terminated. Such "assurances of continued sibling visits" are relevant to whether "terminating parental rights will substantially interfere" with a sibling relationship. (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 175.) As reflected in the permanency planning adoption assessment, one of the parents specifically stated the willingness to continue that sibling relationship to DCFS.[5] Moreover, these assurances were not empty talk. Visits were in fact facilitated; for example, Itzel was invited to and attended Roger's birthday party in July 2021.

As *In re D.O.* notes, "Given the potential tenuousness of future sibling visits, it is the better practice for juvenile courts to also consider the expressly enumerated factors" in section 366.26, subdivision (c)(1)(B)(v). (*In re D.O.*, *supra*, 247 Cal.App.4th at p. 176.) Like *In re D.O.*, this court "conclude[s] it was not error to depart from that practice here, where the record contains substantial evidence that would have allowed the juvenile court to otherwise reach the same conclusion by considering the expressly enumerated factors." (*Ibid.*) With regard to those enumerated factors, Roger and Itzel were not raised together in the same home; they were separated from one another during prior dependency matters as well as during this dependency case and lived apart for a meaningful period of time. They shared some common experiences but, given the time they were

---

[5] Father argues we should not rely on this statement because in his view it lacks credibility. However, in applying the substantial evidence test, "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 947.)

separated, they also had significant experiences apart from one another. As to the strength and closeness of their bond, Roger did not tell anyone he wanted to live with Itzel, or that he wanted more visitation time with her. Roger did not rely on Itzel for meeting his emotional or other needs. Roger did want Itzel present at visits with Father, but that was largely because of his fear of being alone with Father. Finally, with regard to weighing the benefit of ongoing contact versus the benefit of adoption, Roger wanted adoption despite Itzel's objection to it and the possible impact it might have on their relationship.

Accordingly, substantial evidence supports the juvenile court's finding that termination of Father's parental rights would not substantially interfere with the sibling relationship between Roger and Itzel.

## C. The Juvenile Court Did Not Abuse Its Discretion When Terminating Father's Parental Rights as to Roger

The juvenile court found in the alternative that even if one assumed termination of Father's parental rights would substantially interfere with a beneficial sibling relationship between Roger and Itzel, the benefit Roger would derive from preserving the sibling relationship was not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption. The juvenile court did not abuse its discretion in making this determination.

In reviewing for an abuse of discretion, "we will not lightly substitute our decision for that rendered by the juvenile court; rather, we indulge all reasonable inferences to support the juvenile court's decision." (*In re Leon E.* (2022) 74 Cal.App.5th

18

222, 233.) "The test for abuse is whether the trial court exceeded the bounds of reason." (*Ibid*.)

For most of Roger's eight years, he lacked stability based on the family being involved in multiple dependency court cases. Both in connection with this case and in connection with prior dependency matters, Roger lived with the same caregivers (and apart from Itzel). And for an extended period of time, those caregivers provided Roger with a loving and supportive environment, met his needs, and committed to adopting Roger if parental rights ultimately terminated. Roger repeatedly told DCFS social workers he wanted to be adopted by the caregivers, whom he identified as his "parents." Although Itzel opposed adoption for Roger believing it would negatively impact her visits with him, the juvenile court properly evaluated Roger's best interests (including his preference for adoption) and not the desires of his sister when selecting adoption as Roger's permanent plan. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 54 [juvenile court considering sibling exception must focus its analysis on the child being considered for adoption, not the other siblings].) The court accordingly did not abuse its discretion by designating the caregivers as Roger's prospective adoptive parents after terminating parental rights at the section 366.26 hearing in accord with Roger's wishes.

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED

                                WEINGART, J.


We concur:



CHANEY, J.



BENDIX, Acting P. J.