Filed 6/11/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ANDREW M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. S.M. et al., Defendants and Respondents; ANDREW M., a Minor, etc., Appellant. | G063462 (Super. Ct. No. 21DP1437) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Vibhav Mittal, Judge. Reversed and remanded with instructions.

Konrad S. Lee, under appointment by the Court of Appeal, for Minor and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Respondent S.M.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Respondent A.M.

\*     \*     \*

After a juvenile court terminates reunification services, it must select a permanent plan for the dependent child. The Legislature's preferred plan is adoption, and the court may adopt another plan only in exceptional circumstances fitting within a specified exception. Under the parental-benefit exception, the court should avoid terminating parental rights and adopt a less permanent plan if a parent shows that (1) the parent maintained regular visitation with the child, (2) the child has a substantial, positive, emotional attachment to parents, and (3) terminating that attachment would be detrimental to the child even considering the benefit of a new, adoptive home. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)[1]

Andrew M. tested positive for methadone at birth. He was placed in the care of a foster family and remained there throughout these dependency proceedings. His parents—S.M. (Mother) and A.M.

---

[1] All statutory references are to the Welfare and Institutions Code.

(Father)—failed to reunify with him. During the two years of his life up to the permanency planning hearing under section 366.26, Andrew bonded with the foster parents and thrived in their home. They wanted to adopt him. During the same period, Andrew saw Mother and Father only during visits, almost all of them monitored. He enjoyed his time with them and was affectionate toward them. But he showed little distress when separated from them and there was no evidence of any ill effect on him when they were late to visits, cut them short, or missed them entirely. The parents were not otherwise involved in Andrew's life. The juvenile court nevertheless concluded that the parental-benefit exception applied and declined to terminate the parents' parental rights.

Andrew's appointed appellate counsel challenges this ruling on Andrew's behalf, arguing it constituted an abuse of discretion. The Orange County Social Services Agency (SSA) did not appeal the juvenile court's ruling and is nominally a respondent in this appeal, but it nevertheless supports the position of Andrew's counsel and urges us to reverse the court's order. As discussed below, we agree with Andrew's counsel and SSA and conclude that the circumstances here do not support the application of the parental-benefit exception. We therefore reverse the court's order and remand the matter with instructions.

FACTS

I. *The Family and Initial Dependency Proceedings*

Mother and Father had three children in common, including Andrew. Mother also had four other children, who were in the custody of their father. Before Andrew was born, the family was involved in dependency proceedings over Mother and Father's two older children

3

based on the parents' substance abuse problems and criminal history, among other grounds. In 2019, the parents' parental rights as to those children were terminated.

Andrew was born in December 2021. He tested positive for methadone at birth and developed withdrawal symptoms. SSA initiated these dependency proceedings, and the juvenile court ordered Andrew detained, but he remained in the hospital. SSA filed a petition under section 300 alleging, inter alia, that the parents' drug abuse and history of domestic violence placed Andrew at risk. In early January 2022, the juvenile court held a jurisdictional hearing and found the petition's allegations true.

Andrew was released from the hospital later that month and was placed with a foster family. The parents received eight hours per week of monitored visits with Andrew. The foster parents reported that during visits, Mother and Father were appropriate, cared for Andrew, were attentive to his needs, and were loving toward him. At a February 2022 disposition hearing, the juvenile court ordered that Andrew be removed from parental custody and that SSA provide the parents reunification services and allow continued visitation.

II. *The Reunification Period*

Following the juvenile court's dispositional orders, SSA initially allowed the parents 12 hours of unmonitored visits per week. But by April 2022, SSA reinstated a supervision requirement and reduced visitation time to eight hours per week because the parents had missed "numerous" scheduled drug tests. The parents missed some visits for reasons related to COVID-19 but were generally consistent in visiting Andrew.

During this period, Andrew had numerous medical appointments with various doctors. The foster parents notified Mother and Father of the appointments, and the foster mother coordinated with Mother so that Mother could attend, but the parents did not attend the appointments. In June 2022, Andrew was diagnosed with multiple vision conditions: nystagmus, nearsightedness, and optic nerve atrophy. He later received eyeglasses for distance vision.

SSA reported that Andrew was a happy and playful child. He was comfortable in the presence of his foster parents and was "easily soothed" by them. The foster parents were very attentive to his needs and expressed their willingness to adopt him.

The parents' visits continued to go well. The parents were "loving, caring and attentive to the child." They cared for him, brought him toys, and spent time doing such things as teaching him his body parts. Andrew returned from visits "in good spirits." But SSA continued to require supervision and did not increase visitation time because the parents did not attend any of their scheduled drug tests for months.

On November 1, 2022, the juvenile court terminated the parents' reunification services, finding that the parents' progress had been minimal.[2] The court scheduled a permanency planning hearing under section 366.26 for March 2023.

---

[2] Because Andrew was under three years old at the time of his detention, the parents were entitled to only six months of reunification services. (§§ 361.5, subd. (a)(1)(B), 366.21, subd. (e)(3); *In re S.G.* (2024) 100 Cal.App.5th 1298, 1308.)

III. *Developments During Delay in Proceedings*

The juvenile court continued the permanency planning hearing numerous times. Initially, on the date set for the hearing, the court authorized the parents to retain an expert to conduct a bonding study and continued the hearing. The court ordered additional continuances related to the bonding study when the report was not yet ready and when the expert was unavailable. It ordered three continuances due to the unavailability of the court or of Father's counsel. One continuance was to allow settlement negotiations between the parties. And at least two continuances were ordered without the court providing the reasons on the record.[3] Andrew's counsel and SSA objected to some of the continuances. Only on November 20, 2023, over a year after the court terminated reunification services, did the permanency hearing take place.[4]

---

[3] The juvenile court's failure to state the reasons for these continuances violated section 352, subdivision (a)(2), which provides that "[w]henever any continuance is granted, the facts proven which require the continuance shall be entered upon the minutes of the court."

[4] We observe that continuances are disfavored in dependency cases. (§ 352, subd. (a)(1) & (2) [continuances require good cause, and juvenile court must give substantial weight to child's need for prompt resolution and stable environment].) "[L]engthy and unnecessary delay in providing permanency" was "the very evil the Legislature intended to correct" in providing for a permanency planning hearing. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) And the need for permanency and stability is even more urgent for very young children, like Andrew: "The '"unique developmental needs of infants and toddlers"' [citation] justifies a greater emphasis on establishing permanency and stability earlier in the dependency process . . . . [Citation.]" (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175.)

During this period of delay, SSA reported that Andrew—now a toddler—was doing well under the foster parents' care. SSA opined that Andrew was adoptable and noted that the foster parents, who Andrew called "'mama'" and "'dada,'" expressed their desire to adopt him. It stated: "While watching the child with the prospective adoptive parent[s], it is clear that he has bonded with [them], and he appears very happy and secure in their care. He appears conformable with [them] and loves giving and receiving affection." Andrew displayed "a strong attachment" to the foster parents and had "formed a strong relationship and connection" with them. He was in good health, aside from his vision problems. In May 2023, the juvenile court designated the foster parents as Andrew's de facto parents.

Mother and Father continued their visits with Andrew. They sometimes arrived late or left early. During January and February 2023, they missed two visits for reasons unclear from the record. In March, they were "no show[s]" to three different visits. (Capitalization omitted.) Starting in mid-October, the parents visited only four hours per week because of difficulty finding supervisors.

On November 11, 2023, days before the permanency planning hearing, the SSA social worker assigned to the case supervised a short visit between the parents and Andrew. The visit was good. Andrew was happy and grinning when he saw Father. The parents cared for the child and showed him affection, and he sought support from them when needed. When the visit ended, the foster mother picked Andrew up from Mother's arms. He "willingly moved into the foster mother's arms without any distress," and he "displayed no tears or signs of sadness[] as the parents left the visit." Andrew

7

"continued to smile, remaining cheerful and content in the presence of the foster mother leaving the supervised visit."

IV. *The Permanency Planning Hearing*

At the permanency planning hearing, the assigned social worker testified about the parents' visits. She confirmed the parents were consistent with visitations and that Andrew appeared happy and comfortable with them. According to the social worker, during the recent visit she observed, Andrew gave Mother a hug. However, he was not upset to leave the visit. The foster parents also never reported that Andrew was upset when a visit was ending. The social worker noted, in response to questioning, that Andrew was nonverbal.

Mother testified that Andrew would run up to her and Father with excitement when he saw them and that he referred to them as "'Mommy'" and "'Daddy.'" According to Mother, during visits, Andrew would grab her face, kiss her, and rub his nose with hers. He was a "mama's boy" because he always wanted to be with her. Andrew did not cry at the end of visits, but he would hold Mother more tightly, "like he want[ed] to stay with [her]." She believed it would be detrimental to him if he never saw her again because he would eventually find out that he is not with his biological parents.

Father testified that at the beginning of visits, Andrew would notice Mother first, run to her, and say "'Mama, mama.'" He added: "You know, they kind of said that he had an eye problem . . . , but he notices [Mother] from far away. So, I mean, if he had an eye problem, how could he notice her from far away, you know?" According to Father, during visits, he and Mother fed, taught, played with, and cared for Andrew. At the end of visits, Andrew would reach out to him

8

because he wanted Father to take him out of the car seat. Father felt that it would not be good to take Andrew away from the parents because Andrew was going to need to know his family and where he came from.

The parents chose not to present their expert's bonding-study report. SSA sought to admit the report into evidence, but the parents objected, and the court excluded the report.

After the parties concluded their cases, they argued their respective positions. SSA asked the juvenile court to terminate the parents' parental rights, arguing that Andrew was likely to be adopted and that no exception to the legislative presumption in favor of adoption applied. Addressing the parental-benefit exception, SSA contended it did not apply because Andrew had not demonstrated a significant, positive attachment to the parents. It contended that although Andrew enjoyed his time with the parents, two-year-olds enjoyed this kind of attention from many adults, and this did not show a significant bond. It further noted that Andrew left visits easily and was not upset when he was separated from the parents. SSA highlighted the parents' failure to present the results of their expert's bonding study and urged the juvenile court to infer that the report was unfavorable to them.

Andrew's counsel agreed with SSA's position and offered similar arguments as to the parental-benefit exception. She added that even if the juvenile court found that Andrew would benefit from continuing a relationship with the parents, there was no evidence that terminating the relationship would be detrimental, given the benefits of adoption.

Mother's and Father's counsel argued that the parental-benefit exception applied, pointing to the parents' good visits with Andrew and asserting that Andrew was bonded with them. Counsel highlighted evidence that Andrew showed the parents affection during visits and was reluctant to leave at the end of visits. Mother's counsel added that Andrew had "a huge family out there, and if the parental rights are terminated, that goes away." She asked the court to adopt a plan that "would allow Andrew to maintain the contact he ha[d] with his biological family, his half-siblings, his maternal grandmother, his maternal aunt and all of his cousins."[5]

V. *The Juvenile Court's Ruling*

The juvenile court found that Andrew was likely to be adopted but declined to terminate the parents' parental rights, concluding that the parental-benefit exception applied.[6] The court found that the parents maintained regular visitation with Andrew. It also found that Andrew had a "substantial, positive, emotional attachment" with the parents, even considering that he was about two years old and "was never in the parents' care." The court noted that "the reports [were] very positive in terms of the [parents'] interactions

---

[5] The parents' counsel also contended that the sibling-relationship exception applied. This exception applies when termination of parental rights would substantially interfere with a child's sibling relationship and the child's interest in continuing that relationship outweighs the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.)

[6] As to the sibling-relationship exception, the juvenile court concluded it was inapplicable.

with [Andrew]." It declined to draw a negative inference from the parents' failure to present their expert's bonding-study report.

The juvenile court then turned to whether the termination of parental rights would be so detrimental as to outweigh the benefits of adoption. The court noted it had already found "a substantial, positive attachment" and added: "So the [c]ourt does find that Andrew would suffer a loss. There is the connection to the parents, and the parents obviously offer a connection to a broader family that Andrew has benefited from. So the [c]ourt does view[—]and it looks at all the evidence[—]that the third element has also been met. [¶] So the [c]ourt does believe sufficient evidence has been shown as to that third element." The court ordered a permanent plan of legal guardianship. It later ordered that the parents receive three hours per week of supervised visits with Andrew and terminated the proceedings.

Andrew's counsel filed an appeal on his behalf. SSA did not appeal but has filed a letter brief supporting the position of Andrew's counsel.

DISCUSSION

Andrew's appellate counsel contends the juvenile court abused its discretion by failing to terminate parental rights and designating legal guardianship, rather than adoption, as the permanent plan for Andrew. Counsel argues the parental-benefit exception was inapplicable. As discussed below, we agree and therefore reverse the court's order.

I. *Applicable Principles*

"'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.'

11

[Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) Where possible, adoption is the Legislature's preferred permanent plan. (§ 366.26, subd. (c)(1).) "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.*, at p. 53; accord, *In re Collin E.* (2018) 25 Cal.App.5th 647, 665 ["When a child is adoptable, there is a strong preference for adoption over less secure and stable permanent plans"].)

"'"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."'" [Citation.]" (*In re I.E.* (2023) 91 Cal.App.5th 683, 690.) Thus, "[w]hen the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that termination would be detrimental to the child under one of several exceptions. [Citations.]" (*Ibid.*)

The exception relevant here is commonly called the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i); *In re I.E., supra,* 91 Cal.App.5th at p. 690.) A parent claiming that the exception applies has the burden of establishing it by a preponderance of the evidence. (*Caden C., supra,* 11 Cal.5th at p. 636.) To establish that the exception applies, the parent must show three things: (1) the parent maintained "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) "terminating that

12

attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*) If the juvenile court finds that terminating parental rights would be detrimental to the child under the parental-benefit exception, it must "state its reasons in writing or on the record." (§ 366.26, subd. (c)(1)(D).)

"A hybrid standard governs our review. [Citation.] The first two elements involve factual determinations to which the substantial evidence standard of review applies. [Citation.] The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion. [Citation.]" (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.) In assessing the application of the parental-benefit exception, "the practical difference between the standards is not likely to be very pronounced." (*Caden C., supra*, 11 Cal.5th at p. 641.) "At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' [Citation.]" (*Ibid.*)

"A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited . . . . Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) "'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal

13

discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citations.]" (*Ibid.*) "To determine if a court abused its discretion, we must thus consider 'the legal principles and policies that should have guided the court's actions.' [Citation.]" (*Ibid.*)

II. *Analysis*

We agree with Andrew's counsel that the juvenile court abused its discretion by designating legal guardianship, rather than adoption, as the permanent plan for Andrew. We conclude the court erred by applying the parental-benefit exception because the record does not support a conclusion that any harm in terminating parental rights would outweigh the benefits of adoption for Andrew.

Andrew's counsel presents no argument as to whether the parents maintained regular visitation with Andrew—the first element of the exception—and we find no error in the juvenile court's finding that the parents satisfied this requirement. Andrew's counsel also presents no argument as to whether Andrew had a substantial, positive, emotional attachment to the parents—the second element of the exception. But SSA contends that "the court's perfunctory ruling betrayed the lack of evidence available to justify such a dramatic departure from the statutory preference for adoption on these facts, and seemed to embrace a view of the bond sufficient to satisfy the second element that would all but allow the exception to swallow the rule."

The evidence as to the second element was not strong, but we will assume it was sufficient to support an affirmative finding. To satisfy this element, parents "must show more than frequent and loving

14

contact, an emotional bond with the child, or pleasant visits" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318-319), they must establish a substantial, positive, emotional attachment between them and the child (*In re Katherine J.*, at p. 319). "[T]he relationship [between the parents and the child] may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C., supra*, 11 Cal.5th at p. 632.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Andrew was less than two years old at the time of the hearing, "too young to understand the concept of a biological parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.) He never lived with the parents—he had spent his entire life in the care of his foster parents. And the record reveals no particular need that can be met uniquely by the parents. On the other hand, during their visits, the parents would care for Andrew and play with him, and they were loving and affectionate toward him. The parents' testimony supported findings that Andrew called them mommy and daddy, greeted them with excitement, was affectionate with them (particularly with Mother), and sometimes indicated reluctance to leave visits, though he did not cry or otherwise exhibit distress at the end of a visit or after returning to the foster parents. There was also no evidence that he was sad or otherwise affected on the multiple occasions the parents were late to visits or missed them entirely.

15

Given Andrew's young age, the limited time he spent with the parents throughout his short life, and the lack of any reported effect on the child following visits or when the parents missed visits, it is far from clear that the parents' interactions rose above pleasant visits and some emotional connection. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1311-1313, 1316 [affirming termination of parental rights where two-year-old was excited to see mother at visits, called her "'mommy,'" and looked to her for comfort; interactions "amounted to little more than play dates . . . with a loving adult," child had never lived with mother, and there was no evidence child had difficulty separating from mother]; cf. *In re A.L.* (2022) 73 Cal.App.5th 1131, 1137, 1143, 1155 [sufficient evidence of emotional attachment where five-year-old had lived with father until she was three and said that she was afraid she would be unable to see him and wished she could see him every day].) But we will assume the evidence was sufficient to support the juvenile court's finding of the necessary substantial, positive, emotional attachment.

It is the third element we find critically lacking, even given the deferential standard of review. Initially, we agree with SSA that the juvenile court's analysis of this element was "conclusory." The court noted it had already found "a substantial, positive attachment" and added: "So the [c]ourt does find that Andrew would suffer a loss. There is the connection to the parents, and the parents obviously offer a connection to a broader family that Andrew has benefited from. So the [c]ourt does view[—]and it looks at all the evidence[—]that the third element has also been met. [¶] So the [c]ourt does believe sufficient evidence has been shown as to that third element." This explanation

16

offered little more than a bare recitation of the statutory requirements and did not satisfy the court's duty to "state its reasons . . . on the record" for determining that the parental-benefit exception applied. (§ 366.26, subd. (c)(1)(D); cf. *In re M.V.* (2023) 87 Cal.App.5th 1155, 1184, 1186 [vacating termination of parental rights and remanding for new hearing in part because juvenile court's analysis of second elements was "cursory"].)

What the juvenile court did say revealed its reliance on an improper factor—Andrew's relationship with members of the "broader family."[7] The parental-benefit exception deals with the child's relationship with the *parents*, and it is not appropriate to consider relationships with other family members in assessing this exception: "the Legislature recognized that in certain specific instances, a plan other than adoption may be appropriate and less detrimental to the rights of both parent and child. [Citation.] Preserving the child's relationships with relatives other than a parent [or sibling] was not one of those instances." (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 & fn. 2 [child's relationship with grandmother irrelevant to termination of parental rights]; accord, *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 427 [before creation of sibling-relationship exception, sibling interaction

---

[7]  Father argues, "[I]n referring to 'a broader family[,]' the [juvenile] court was making a finding that the parents will make up part of [Andrews]'s broader family," together with the foster parents. That is not a reasonable reading of the court's statement that "the parents obviously offer a connection to a broader family," especially given the argument of Mother's counsel at the hearing that termination of parental rights would deprive Andrew of a connection to such relatives as his grandmother, aunt, and cousins.

was irrelevant to termination of parental rights].)[8]  The court's reliance on an improper factor was itself an abuse of discretion.  (*In re M.V., supra*, 87 Cal.App.5th at pp. 1185-1186.)

Under a proper analysis, the facts of this case cannot support the application of the parental-benefit exception.  A "'showing [that] the child would derive *some* benefit from continuing a relationship maintained during periods of visitation'" is not a sufficient ground to depart from the statutory preference for adoption.  (*In re G.H., supra*, 84 Cal.App.5th at p. 25.)  It is only "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, [that] termination would be 'detrimental to the child due to' the child's beneficial relationship with a parent.  [Citation.]" (*Caden C., supra*, 11 Cal.5th at pp. 633-634, italics omitted.)

In determining whether terminating parental rights would be detrimental to the child, the juvenile court must assess "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)  "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home.  [Citation.]" (*Id.* at p. 634.)  In *Caden C.*, our

---

[8]  The Legislature added the sibling-relationship exception to section 366.26 in 2001, after the decisions in *In re Tabatha G.* and *In re Cliffton B.*  (Stats. 2001, ch. 747, § 3.)  As noted, the juvenile court found this exception inapplicable.

Supreme Court provided examples of potential harms from the loss of a parental relationship based on the facts of that case: "the effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Id.* at p. 633.)

Even assuming a substantial emotional attachment between Andrew and the parents, the relationship between them cannot be deemed strong for purposes of the detriment analysis. (*Caden C., supra*, 11 Cal.5th at p. 634.) As discussed, Andrew was very young and never lived with the parents. Throughout his life, his only interactions with them were during hours-long visits, almost all of which were monitored. Although he shared an affectionate connection with the parents during visits and sometimes indicated reluctance to leave— through a tight hug or reaching out from his car seat—there is no evidence that he ever showed distress or was upset when separating from them.

To the contrary, a social worker observing a visit days before the permanency planning hearing described Andrew separating from the parents with ease. She recounted him "willingly mov[ing] into the foster mother's arms without any distress and display[ing] no tears or signs of sadness[] as the parents left the visit" and "continu[ing] to smile, remaining cheerful and content in the presence of the foster

mother leaving the supervised visit."[9]  As noted, the parents missed multiple visits and their actual visitation time was reduced—first from 12 hours per week to 8 hours, and then to about 4 hours per week shortly before the hearing.  There was no evidence that the missed visits or reduced time with the parents had any negative impact on Andrew.

Outside of visits, there is no evidence the parents played a meaningful role in Andrew's life.  They were invited to medical appointments, and the foster mother coordinated with Mother so that she could attend.  But the parents did not attend.  Nor does it appear that they otherwise had an understanding of Andrew's health circumstances.  As noted, Andrew was diagnosed with nystagmus, nearsightedness, and optic nerve atrophy and wore eyeglasses.  At the hearing, Father expressed only a vague awareness of Andrew's eye problems:  "[T]hey kind of said that he had an eye problem . . . , but he notices [Mother] from far away.  So, I mean, if he had an eye problem, how could he notice her from far away, you know?"  The parents' lack of meaningful engagement or familiarity with Andrew's medical condition is not a marker of a strong parent-child relationship.  (Cf. *In re A.L., supra,* 73 Cal.App.5th at pp. 1158-1159 [affirming termination of

---

[9]      Mother asserts that because Andrew was a happy and friendly child, "there simply was no way [the parents] could have demonstrated that Andrew suffered detriment when removed from their care."  We take Mother's point to be that a child's lack of apparent distress when separating from his or her biological parents does not necessarily show a lack of detriment.  We agree.  But the circumstances nevertheless leave an evidentiary void, and as discussed above, it is the parents' burden to fill this void and establish that the parental-benefit exception applies.  (*Caden C., supra,* 11 Cal.5th at p. 636.)

parental rights and noting, in assessing strength and quality of relationship, that parent had not been involved in child's medical decisions or issues].) Overall, the circumstances point to the relative weakness of the relationship and indicate no meaningful detriment that would flow from terminating it.

The juvenile court described no specific harm that Andrew would likely or potentially suffer from the termination of parental rights. Nor do the parents do so on appeal. Instead, they simply rely on the court's affirmative finding on the second element. Father reiterates that termination of parental rights "would be a loss" to Andrew because he "had a connection to the parents." And Mother similarly points to the loss of Andrew's "emotional connection with his parents."[10]

There is no question that there are benefits in continued visits with loving parents to which the child has some substantial attachment. Yet to justify withholding the "security," "stability," and "'sense of belonging a new family would confer'" (*Caden C., supra*, 11 Cal.5th at p. 633), the parents must prove more than "*some* benefit" (*In re G.H., supra*, 84 Cal.App.5th at p. 25). We do not suggest the parents must prove that any particular kind of harm would flow from the termination of parental rights. But they must prove some type of harm beyond the fact that their loving visits would cease. (See *Caden C., supra*, 11 Cal.5th at p. 634 [providing examples of potential harms].)

---

[10] Mother also references Andrew's connection with his siblings and "the rest of his family," but as explained, those are improper considerations in assessing the parental-benefit exception. (*In re Jose C.* (2010) 188 Cal.App.4th 147, 163, fn. 15.)

In appropriate cases, the strength of the relationship alone can support a finding that its termination would have a "destabilizing" effect on the child. (*Caden C., supra,* 11 Cal.5th at p. 634.) But as discussed, the circumstances here do not support a conclusion that the parents' relationship with Andrew was "so important" as to outweigh the benefits of adoption. (*Id.* at pp. 633-634.) In other words, this case cannot be deemed the kind of ""'extraordinary case"'" in which preservation of parental rights prevails over the Legislature's preference for adoptive placement. (*In re I.E., supra,* 91 Cal.App.5th at p. 690.) Accordingly, we reverse the juvenile court's order.

## DISPOSITION

The juvenile court's order under section 366.26 is reversed, and the matter is remanded. The court shall hold a new permanency planning hearing forthwith and, absent an appropriate showing under section 388 that changed circumstances justify different orders, shall terminate parental rights and order a permanent plan of adoption.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


SANCHEZ, J.